Argued and submitted June 7, 1999, reversed and remanded with instructions
July 12, 2000

## William VOKOUN
## and Paula Vokoun,
### *Respondents,*

*v.*

## CITY OF LAKE OSWEGO,
## a municipal corporation,
### *Appellant.*

## (96-11-052; CA A101203)

7 P3d 608

Timothy J. Sercombe argued the cause for appellant. With him on the briefs were William K. Kabeiseman and Preston Gates & Ellis LLP.

Tracy Pool Reeve argued the cause for respondents. With her on the brief were Mark P. Reeve and Reeve Kearns PC.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LANDAU, P. J.

## LANDAU, P. J.

Plaintiffs initiated this action against the City of Lake Oswego (City) for negligence and inverse condemnation for damage to their property resulting from a landslide that occurred following an unusually heavy rain. They alleged that the landslide was caused by the City's failure to maintain its storm drainage system properly. The trial court allowed the claims to go to the jury, which returned a verdict in favor of plaintiffs on both claims. The trial court struck a portion of the negligence verdict as duplicative of the inverse condemnation claim, entered judgment for plaintiffs, and awarded attorney fees. The City appeals, arguing that the trial court erred in failing to direct a verdict in its favor on the inverse condemnation claim, because property damage resulting from the failure of the City to maintain a drainage system is not a "taking" of property within the meaning of Article I, section 18, of the Oregon Constitution. The City also contends that the trial court erred in failing to direct a verdict in its favor on the negligence claim on the ground of discretionary immunity. The City advances a number of other assignments of error, but, because we find those two to be dispositive, we do not reach the others. We reverse and remand.

We state the relevant facts in the light most favorable to plaintiffs. Plaintiffs purchased a residence located in the "Red Fox Hills" subdivision of Lake Oswego. The lot is approximately 16,300 square feet. The house is located at the southern end of the lot. At the rear of the house is a deck with a dog run underneath. The property slopes northward from the residence down to a ravine. The ravine itself is located in Tryon Creek State Park, which borders plaintiffs' lot on the north and east.

Storm water from the subdivision drains through an underground pipe along the western border of plaintiffs' lot. The pipe ends at an outfall located at the northwest corner of the lot. Storm water drains through the pipe and out into the ravine in Tryon Creek State Park. The outflow does not run onto plaintiffs' property.

The City scheduled no regular inspection or maintenance for the drainage system in plaintiffs' subdivision. The

City's budget for storm water management was limited to revenues generated by storm water utility fees, between $300,000 and $400,000 per year. The City adopted a capital facility plan for its various utilities, including storm water facilities. The plan includes the development of lists of capital improvement projects for any project in excess of $25,000. The prioritized list of storm drainage projects for 1993-96 did not include any projects in the Tryon Creek State Park area. Projects that would require less than $25,000 were undertaken only in response to resident complaints. The City determined as a matter of policy that it did not have the resources to develop an inspection program to identify potential problem areas in advance of resident complaints.

In 1986, a maintenance worker for the City noticed some erosion in the ravine and reported it. The area was scheduled for maintenance work. In 1989, the City inspected the area below the outfall, determined that the most cost-effective solution was to load rocks and asphalt into the eroded area, and completed the repair work. There is no record that the City received any complaints about erosion in the area after that.

During the week of February 5, 1996, the Portland area received an extraordinary amount of rainfall—over eight inches in four days. The rain, coupled with warm temperatures and melting snow pack, caused flooding and at least a dozen landslides throughout the area. On February 8, the waters of the Willamette River rose, flood waters backed up into Tryon Creek, and Lake Oswego rose to historic levels. The rain also caused a substantial amount of storm water to flow through the pipe located along the border of plaintiffs' lot and down the ravine. That flow caused the ground water level to rise, contributing to unstable soil conditions. The water's volume and velocity also caused severe erosion below the outfall. That erosion removed support from plaintiffs' property further uphill. As a result, the northeast portion of plaintiffs' lot shifted several feet to the northeast. The movement of earth destroyed several trees and shrubs, undercut the footings for the deck, and damaged the dog run. The slide did not damage the house itself.

City officials visited the site the following day. The City concluded that the house was not in danger but that the deck was unsafe and should not be used until corrective measures were taken. Plaintiffs then removed the deck and the dog run.

Plaintiffs filed a complaint for damages resulting from the slide. They pleaded claims of inverse condemnation and negligence, based on the City's alleged failure to inspect and maintain the outfall properly. According to plaintiffs, if the City had monitored the site properly, it would have discovered the potential for significant erosion from the outflow and then could have either piped the water through the ravine or built a stilling basin to ameliorate the erosion. The City answered, asserting, among other things, that its decisions concerning the extent to which it would devote public funds to inspect, repair, or maintain its drainage system are subject to discretionary immunity under ORS 30.265.

At the close of plaintiffs' case, the City moved for a directed verdict on the inverse condemnation claim. The City argued that, although plaintiffs may have suffered damage to their property, such damage does not amount to a "taking" of property within the meaning of Article I, section 18, of the Oregon Constitution. The City also moved for a directed verdict on the negligence claim on the ground that it is immune from liability under ORS 30.265. The trial court denied both motions. The City requested that the immunity defense at least be submitted to the jury. The trial court declined the City's request. The case was submitted to the jury without instructions concerning discretionary immunity, and the jury returned a verdict for plaintiffs on both the inverse condemnation and negligence claims. On the inverse condemnation claim, the jury awarded $138,410. On the negligence claim, it awarded $69,205 for property damage, $80,750 for economic damage, and $12,000 for noneconomic damage. The trial court struck the property damage award as duplicative of the inverse condemnation award and entered judgment on the balance, plus attorney fees.

The City first assigns error to the trial court's denial of its motion for a directed verdict on the inverse condemnation claim. The City argues that, as a matter of law, the facts

as submitted to the jury cannot give rise to a claim for inverse condemnation. According to the City, its failure to inspect or maintain the drainage system properly perhaps could give rise to a claim for negligence, but not for inverse condemnation. Plaintiffs argue that the case law reflects no such distinction between liability in inverse condemnation and in negligence. According to plaintiffs, whenever government action substantially interferes with private property without compensation, a claim will lie for inverse condemnation.

■ Article I, section 18, of the Oregon Constitution, provides:

> "Private property shall not be taken for public use * * * without just compensation; nor except in the case of the state, without such compensation first assessed and tendered * * *."

The clause applies both to the formal exercise of the power of eminent domain and to government actions that have the effect of taking property without the formal exercise of that power. *Dept. of Transportation v. Hewett Professional Group*, 321 Or 118, 130-31, 895 P2d 755 (1995). The latter class of claims are known as "inverse condemnation" claims. *Id.* The dispositive question in such cases is whether the government action amounts to a "taking" within the meaning of Article I, section 18. *Id.*

■■ A "taking" generally is regarded as the "destruction, restriction, or interruption of the necessary use and enjoyment" of private property for a public purpose. *Moeller et ux v. Multnomah County*, 218 Or 413, 425-27, 345 P2d 813 (1959). It often is more generally formulated as any "substantial" interference with property rights. *Hawkins v. City of La Grande*, 315 Or 57, 68, 843 P2d 400 (1992). Whether an interference with property rights is "substantial" is a jury question. *Id.* at 72.

■ A "taking" of property within the meaning of Article I, section 18, does not include mere damage to the property, however. *Hawkins*, 315 Or at 72. Many other state constitutions prohibit both takings and damage to private property without compensation; Oregon's prohibits only takings. In consequence, the courts have recognized that the focus of

Article I, section 18, is narrower than that of other state constitutional takings clauses. *See, e.g., Hawkins*, 315 Or at 68; *Moeller*, 218 Or at 425-27.

 A "taking" of property likewise does not include interference with private property rights that is merely a consequence of negligent government conduct. Only interference with property rights that is a natural and ordinary consequence· of a lawful government action may form the basis of an inverse condemnation claim. On point in that regard is *Patterson v. Horsefly Irrigation Dist.*, 157 Or 1, 69 P2d 282, 70 P2d 33 (1937). In that case, the plaintiffs sued an irrigation district for damage to their property resulting from water overflowing some irrigation ditches. According to the plaintiffs, the district had neglected to maintain the ditches by permitting them to become overgrown with vegetation. The plaintiffs prevailed on a negligence claim against the district, but, on appeal, the district successfully argued for a reversal of the decision. The plaintiffs argued that the claim could be affirmed on the alternate ground that, by permitting the ditches to overflow, the district effectively had taken their property without compensation in violation of Article I, section 18. The Supreme Court rejected that argument, explaining that there is a distinction between interference with property rights occasioned by mere negligence and interference that is the "necessary effect" of lawful government actions for a public use. *Id.* at 18-19. The court explained, quoting from a federal court decision on similar facts:

> " 'If the plaintiff sustained damage * * * by the temporary negligence of the defendant to so maintain, operate, and use its canal as not to injure plaintiff's property, it is liable on account of its negligence to pay that damage. If, on the other hand, the defendant has inflicted damage upon the property of the plaintiff *that is the necessary effect of its permanent maintenance and operation of this canal in a lawful and careful manner*, which the state has authorized it to do for the public use, it is liable to pay this damage to the plaintiff because the infliction of such damage without compensation is a violation of the constitutional prohibition against the taking * * * of private property for public use without just compensation therefor.' "

*Id.* (citations omitted; emphasis added) (quoting *Hooker v. Farmers' Irrigation District*, 272 F 600, 603 (8th Cir 1921)).

The test, the court held, is whether the plaintiffs would have suffered the interference without the negligence of the irrigation district. If not, no claim for inverse condemnation may lie. Negligence, by definition, cannot be the "necessary effect" of lawful government action for a public use. *Id.* at 18.

To similar effect is *Tomasek v. Oregon Highway Com'n*, 196 Or 120, 248 P2d 703 (1952). In that case, the state's construction of a bridge eliminated a substantial portion of a flood plain, which had the effect of forcing water down the river at a faster rate and causing erosion downstream. One of the downstream owners initiated an inverse condemnation claim for the erosion of his farmland. The court upheld the claim, concluding that erosion was a natural and ordinary consequence of the state's entirely lawful actions in constructing the bridge. *Id.* at 150-51. There was no claim that the bridge had been constructed or maintained in anything other than a lawful manner. *Id.*

■ In this case, plaintiffs argue that the distinction between negligent interference with private property rights and inverse condemnation no longer can be maintained in light of the Supreme Court's more recent decision in *Hawkins*. In *Hawkins*, the trial court had dismissed an inverse condemnation claim, but had permitted a negligence claim to proceed to the jury as to the destruction of crops and livestock occasioned by the City of La Grande's intentional release of sewage-laden water onto the plaintiffs' farm land. The jury found for the plaintiffs. On appeal, the Supreme Court held that the trial court erred in dismissing the inverse condemnation claim, but it required no retrial on that claim. *Hawkins*, 315 Or at 72. The court reasoned that there was no dispute that the destruction of the crops was occasioned by the City's actions and that the only remaining issue would have been the amount of damages. But, given that the jury already had calculated the amount of damages in rendering a verdict on the negligence claim, the court concluded that the City was precluded from relitigating the amount of damages on remand:

> "Although the trial court erred when it prevented the jury from considering plaintiffs' inverse condemnation claim, that error does not require a new trial in this case because

the jury already has assessed the amount of plaintiffs' damages for the crops and livestock killed and thus taken. * * * The damage amounts found by the jury are binding against defendant in the inverse condemnation context, through the application of the principles of issue preclusion, in that defendant has had full opportunity and motivation to litigate the amount of damages that plaintiffs may recover for the crops and livestock."

*Id.* The court did not address the issue before us in this case, much less overrule a line of cases dating back more than 75 years.

■ To be sure, it plausibly could be argued that, because the jury in *Hawkins* had found that the destruction of the plaintiffs' crops and livestock was a result of the City's negligence, under the rule of *Patterson* and *Tomasek*, the inverse condemnation claim should have been rejected, and the fact that the court did not do that suggests that *Patterson* and *Tomasek* are no longer good law. We reject such a reading of *Hawkins*, however, for three reasons. First, no party made that argument in *Hawkins*, and the court did not address it. Second, we must not lightly undertake to declare that the Supreme Court has overruled its own longstanding precedent without saying so. *See OTECC v. Co-Gen*, 168 Or App 466, 476 n 8, 7 P3d 594 (2000) ("if [an Oregon Supreme Court decision] is to be disavowed, the Oregon Supreme Court should do the disavowing"). Third, adopting such reasoning would lead to patently absurd results. Eliminating the distinction between interference caused by negligence and that caused by the natural consequences of legitimate governmental acts effectively converts every negligence action against the state for damage to property into a takings claim; whether the damage is sufficient to constitute a "substantial" interference with property rights is, after all, a jury question.

■ That is not to say that only intentional acts are actionable under Article I, section 18. The courts have made clear that the test is whether interference with private property is a "natural and ordinary consequence" of the lawful government action taken for a public purpose. As the Supreme Court explained in *Morrison v. Clackamas County*, 141 Or 564, 569, 18 P2d 814 (1933):

"[I]t is no defense that there was no specific intention on the part of defendant to appropriate plaintiff's property, but the defendant must be held to have intended to do those things which are the natural and ordinary consequences of his act."

With the foregoing principles in mind, we turn to the facts of this case. There can be no question but that the erosion of plaintiffs' property effected the "destruction, restriction or interruption of necessary use and enjoyment" of their property. *Moeller*, 218 Or at 431. A large quantity of land slipped down into the ravine, causing the loss of soil, trees, and shrubs. But, as we have noted, not all such interference is compensable under Article I, section 18. Only if it is the natural and ordinary consequence of government action that was taken for public use will the interference constitute a compensable taking. As the court made clear in *Patterson*, if the interference was the consequence of the City's negligence, there can be no recovery under Article I, section 18.

In this case, plaintiffs expressly predicate their claims on the City's negligence. The erosion of plaintiffs' property was not a natural consequence of maintaining a drainage outfall "in a lawful and careful manner." *Patterson*, 157 Or at 19. If anything, it was a consequence of the City failing properly to maintain and operate the drainage outfall. According to plaintiffs, had the City not acted negligently, the erosion would not have happened. Under *Patterson*, the erosion that resulted might be compensable in negligence, but it is not compensable under Article I, section 18. We conclude that the trial court erred in denying the City's motion for a directed verdict on plaintiffs' inverse condemnation claim.

The City also assigns error to the trial court's denial of its motion for a directed verdict on the negligence claim on the ground of discretionary immunity. The City argues that it was entitled to judgment on the negligence claim as a matter of law, because the undisputed facts reveal that it was subject to discretionary immunity. In the alternative, the City argues that, at the least, it had submitted sufficient evidence in support of the defense to require its submission to the jury. Plaintiffs argue that the trial court did not err in rejecting the

defense as a matter of law. They insist that the record shows that the City did not exercise any discretion and merely did nothing about erosion in the Tryon Creek State Park area.

ORS 30.265(3) provides, in part:

"Every public body and its officers, employees and agents acting within the scope of their employment or duties * * * are immune from liability for:

"* * * * *

"(c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

In *Lowrimore v. Dimmitt*, 310 Or 291, 296, 797 P2d 1027 (1990), the Supreme Court held that discretionary immunity

"will apply to decisions involving the making of policy, but not to routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action."

Not every policy decision amounts to an exercise of discretion. As the court explained in *McBride v. Magnuson*, 282 Or 433, 436-37, 578 P2d 1259 (1978):

"It depends on the kind of judgments for which responsibility has been delegated to the particular officer. Discretion, as this court has noted in other contexts, involves 'room for policy judgment,' or the responsibility for deciding 'the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued.' It involves the delegated responsibility for 'assessment and ranking of the policy objectives explicit or implicit in the statute' and for the judgment that one or more of these objectives will be served by a given action. In other words, insofar as an official action involves both the determination of facts and simple cause-and-effect relationships and also the assessment of costs and benefits, the evaluation of relative effectiveness and risks, and a choice among competing goals and priorities, an official has 'discretion' to the extent that he has been delegated responsibility for the latter kind of value judgment."

(Citations omitted.)

 That does not mean that the choice must be to undertake an affirmative act; in some cases, responsible public officials may weigh the policy alternatives and attendant risks and benefits and determine not to take a particular course of action. But what is required is that the public officials make a choice, that is to say, the public officials must exercise their discretion. In *Stevenson v. State of Oregon*, 290 Or 3, 14-15, 619 P2d 247 (1980), for example, the Supreme Court explained:

> "If the responsible officials had determined, for example, that their budgets would not permit them to provide all desirable safety features and that the public would be better served by facilities other than cattle guards or median barriers, that would constitute the immune exercise of governmental discretion."

Similarly, in *Garrison v. Deschutes County*, 162 Or App 160, 986 P2d 62 (1999), *rev allowed* 329 Or 650 (2000), the plaintiff argued that the defendant county could not claim immunity for failing to install a safety barrier or warning signs at a garbage transfer station. According to the plaintiffs, discretionary immunity cannot protect a government agency or official from failing to act on its duty of care. We disagreed, holding:

> "[A]s long as the decision-making body has acknowledged and assessed the various risks to public safety and has made its decision based on its understanding of those risks in light of its objectives, the body cannot be held liable if it should turn out that it made the wrong decision."

*Id.* at 167.

 If the historical facts as to the actions of the government agency or official are not disputed, whether the agency or official is subject to discretionary immunity is a question of law. *Sager v. City of Portland*, 68 Or App 808, 812, 684 P2d 600, *rev den* 298 Or 37 (1984).

 In this case, there is no dispute as to the historical facts. The only issue is the legal significance of those facts. The City made a policy choice about the use of its limited revenues for storm water management. It prioritized a list of

capital improvement projects exceeding $25,000, and the prioritized list did not include inspection, maintenance, or repair of the drainage outfall near plaintiffs' property. That is precisely the sort of discretionary policy decision that is subject to ORS 30.265(3). As for the smaller projects, the City made a conscious policy choice to use its limited resources to respond to resident complaints about actual, existing problems with the drainage system rather than to use the resources to investigate on its own whether any problems exist. Again, that is precisely the sort of "assessment or ranking of policy objectives" that is subject to discretionary immunity. *McBride*, 282 Or at 437. We therefore conclude that the trial court also erred in failing to grant the City's motion for a directed verdict on the negligence claim.

Reversed and remanded with instructions to enter judgment for the City of Lake Oswego.