Argued and submitted January 20, reversed and remanded for new trial;
cross-appeal dismissed as moot August 30, 2000

Harold and Betty HUTCHESON,
husband and wife;
Jim and Anne Trimble,
husband and wife;
and Tim and Deanna Tornow,
husband and wife,
*Respondents - Cross-Appellants,*

*v.*

CITY OF KEIZER,
a municipal corporation,
*Appellant - Cross-Respondent,*

*and*

MULTI/TECH ENGINEERING SERVICES, INC.;
Tran Co.; C.A.W.S., Inc.;
and Lawrence T. Epping and Jeanette T. Epping,
dba Granada Land Company,
*Defendants.*

(97C-10988; CA A102696)

8 P3d 1010

Robert E. Franz, Jr. argued the cause for appellant - cross-respondent. On the briefs was Kathryn D. Piele.

Norman R. Hill argued the cause and filed the briefs for respondents - cross-appellants.

Before Haselton, Presiding Judge, and Wollheim and Kistler, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant, City of Keizer (the City), appeals from a judgment for plaintiffs, homeowners, on a negligence action arising out of the flooding of the Country Glen Estates subdivision in 1996. The City contends, *inter alia*, that it was immune from liability pursuant to the discretionary function immunity provision of the Oregon Tort Claims Act (OTCA), ORS 30.265, and that the court erred in giving a "less satisfactory evidence" instruction. Plaintiffs cross-appeal, asserting that the court improperly applied the OTCA in limiting their recovery. On appeal we conclude that, although the trial court correctly denied the City's motion for a directed verdict on its defense of immunity, the court erred in giving plaintiffs' requested "less satisfactory evidence" instruction. That error was not harmless; consequently, we reverse and remand for a new trial. Our disposition of the appeal moots the cross-appeal.

The following facts are undisputed: In December 1993, real estate developer Lawrence Epping submitted a "Subdivision Application" to the City. The application requested approval of Epping's plan to divide a 66-acre parcel into 190 residential lots and develop it as the Country Glen Estates subdivision. A public hearing on the application was held, and the city hearings officer issued an order approving the subdivision subject to certain conditions relating to, among other things, the developer's submission of an "engineering site plan" to both the Department of Public Works and the Community Development Department for "review and approval." Epping's engineer submitted the site plan and related documents to the City and, upon administrative approval, development of the Country Glen Estates subdivision proceeded as planned.

Plaintiffs Betty and Harold Hutcheson purchased lot 74 in the Country Glen Estates subdivision, and they moved into their house in October 1995. Plaintiffs Anne and Jim Trimble and Jim and Deanna Tornow bought lots 65 and 70, and had moved into their new homes by early February 1996. All three lots are located in one of the two cul-de-sacs on the southern edge of the subdivision, which borders on the

Labish Ditch, a manmade drainage canal. The two cul-de-sacs on which plaintiffs' properties are located lie at an elevation slightly below that of the Labish Ditch.

In early February 1996, the Salem-Keizer area was inundated with unusually heavy rainfall. On February 5, the water in the Labish Ditch began to overflow its banks. The Trimbles were forced to evacuate their home, which was the closest in proximity to the Labish Ditch, on February 7. The next day, the water continued to rise, and the Tornows and Hutchesons were eventually forced to evacuate their homes as well. By February 13, the waters had receded, and plaintiffs returned to their homes. At the time, plaintiffs believed that the February flood was an extraordinary nonrecurring natural disaster caused by the unusually heavy rains. However, ten months later, on December 31, 1996, the Labish Ditch again overflowed its banks and again flooded plaintiffs' homes.

In March 1997, plaintiffs brought this negligence action against the City to recover damages for the depreciation of their homes and the value of personal property destroyed or damaged in the two floods.[1] Plaintiffs' complaint alleged five specifications of negligence under the general theory that the City was negligent "in failing to use reasonable care in reviewing [Epping's] subdivision application and supporting documentation and in approving [Epping's] subdivision and allowing residential development of the subject property with homes now owned by Plaintiffs."[2]

The case was tried to a jury over two weeks in February and March 1998. At the close of all evidence, the City moved for a directed verdict, arguing that plaintiffs had failed to prove each specification of their negligence claim and, alternatively, that, pursuant to ORS 30.265, "the decisions made by the City of Keizer through its engineer,

---

[1] Plaintiffs also named as defendants Lawrence Epping, the developer of the Country Glen Estates subdivision, and Multi/Tech Engineering Services, the engineers who designed the subdivision. The jury ultimately determined that both Epping and Multi/Tech were negligent, finding each liable for 35 percent of plaintiffs' damages. Neither Epping nor Multi/Tech is a party to this appeal, and the judgments against them are not at issue.

[2] Plaintiffs' complaint also alleged a claim for inverse condemnation.

William Peterson, are entitled to and should be afforded [discretionary] immunity."[3] The trial court denied City's motion.

The jury returned a general verdict for plaintiffs, concluding that the City was 30 percent negligent and that the two other codefendants, 169 Or App at 513 n 1, were each 35 percent at fault. The jury awarded the Trimbles total damages of $256,939.15, the Tornows total damages of $80,432.35, and the Hutchesons total damages of $41,810. The City subsequently moved for an order reducing the verdict in favor of the Trimbles to $50,000, on the ground that the OTCA limited the City's liability to a maximum of $50,000 per claimant for any single accident or occurrence, ORS 30.270, and reducing the verdict in favor of the Hutchesons to "the amount of demonstrable equity" the Hutchesons had in their home. The trial court granted the City's motion and entered judgment against the City for the Trimbles for $50,000, for the Tornows for $24,129.70, and for the Hutchesons for $9,501.05.

On appeal, the City asserts 13 assignments of error. Because of our ultimate disposition, we address, primarily, the City's fourth assignment of error, challenging the trial court's denial of the City's motion for a directed verdict on its defense of discretionary immunity, and the City's twelfth assignment of error, which asserts that the court erred in giving the jury the "less satisfactory evidence" instruction. On cross-appeal, plaintiffs assign error both to the trial court's application of the OTCA damages limitation to reduce the Trimbles' recovery to $50,000, and to the trial court's reduction of the verdict in favor of the Hutchesons. Given our disposition, plaintiffs' cross-appeal is moot.

■ The City's contention that it was immune from liability is potentially dispositive—*i.e.*, if the City is correct, it is entitled to outright reversal and not merely (as with other

---

[3] The City had previously moved for directed verdict at the close of plaintiffs' case, asserting that plaintiffs had failed to prove their inverse condemnation claim and all five specifications of their negligence claim. Plaintiffs withdrew their third specification of negligence at that time. The court then granted directed verdict for the City on the inverse condemnation claim, but denied the City's motion on the negligence claim.

assignments of error) a remand for a new trial. Consequently, we begin with the court's denial of a directed verdict for the City on its defense of discretionary immunity.

ORS 30.265(3) provides, in part:

"Every public body and its officers, employees and agents acting within the scope of their employment or duties, * * * are immune from liability for:

"* * * * *

"(c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

The City argues that plaintiffs' negligence claim arises from the City's approval of the subdivision application; that that approval by a hearings officer was a "discretionary" act; and, thus, that the City is entitled to discretionary immunity under ORS 30.265. The City particularly invokes *J. Gregcin, Inc. v. City of Dayton*, 39 Or App 743, 593 P2d 1231, *rev'd on other grounds* 287 Or 709, 601 P2d 1254 (1979), for the proposition that government approval of a subdivision application, and "any decision related thereto," is an exercise of discretion.[4] In the City's view, approval of a subdivision should be viewed as one overarching policy decision, and every smaller decision that is part of that approval process—even ostensibly "ministerial" decisions—is protected by discretionary immunity. Plaintiffs respond that the object of their negligence claim was not the hearings officer's approval of the subdivision application. Rather, plaintiffs assert that the conduct that gave rise to their negligence claim was the *subsequent* (*i.e.*, post-approval) "failure of City staff to review" the "construction plans or drainage basin calculations submitted by developer." Plaintiffs assert that such post-approval conduct by City staff partakes of "ministerial," not "discretionary," functions.

We agree with plaintiffs. Although their specifications of negligence were framed, and phrased, broadly,[5] their

---

[4] In *J. Gregcin, Inc.*, we observed that "[a] decision whether or not to approve a subdivision, involving consideration of factors such as congestion, pollution, burdens on public services and public need for the subdivision would be an exercise of discretion." 39 Or App at 747 (citation omitted).

[5] Plaintiffs' four specifications that were submitted to the jury alleged:

evidence and arguments—the substance of the case as it was actually tried and submitted to the jury—demonstrate that plaintiffs' negligence claim ultimately rested on the conduct of two City employees, William Peterson, the City engineer, and Wally Mull, the City's public works director. As amplified below, that conduct—Peterson's and Mull's action and inaction—did not involve the exercise of discretion. In explaining that conclusion, we recount the evidence describing Peterson's and Mull's functions in the subdivision application process.

At trial, John Morgan, the City's community development director, explained that the City's subdivision application procedure entails the following sequence of events: (1) Upon receiving an application to subdivide property, the Community Development Department sends a notice of a public hearing to nearby property owners and requests comments from affected agencies. (2) The Community Development Department develops a staff report analyzing whether and how the proposed subdivision meets the land use and zoning criteria required by local ordinance. (3) A public hearing on the proposal is held before the city hearings officer. There is opportunity for public comment, and the Community Development Department submits its staff report in

"The City of Keizer was negligent in failing to use reasonable care in reviewing [Epping's] subdivision application and supporting documentation and in approving [Epping's] subdivision and allowing residential development of the subject property with homes now owned by Plaintiffs in the following particulars:

"A. By allowing the subdivision of property for home sites and allowing homes to be built on land containing hydric soils in such areas that the City knew or should have known would be subject to seasonal flooding or which should have been placed in a flood overlay zone;

"B. By failing to require the developers to provide drainage adequate to drain the subject property in periods of heavy rain when the City knew or should have known based on prior history of the parcels and the general topography of the land that the parcels would be subject to flooding during heavy rains;

"* * * * *

"D. By allowing the developer to construct a storm drain system which had drain lines constructed too low and without sufficient fall to prevent surcharging of storm water into the subdivision;

"E. By failing to verify that sufficient examination was made by the land developer of the drainage impact on down stream facilities and the subject real property."

both written and oral form. (4) The hearings officer then renders a decision—*i.e.*, to approve, disapprove, or conditionally approve the proposal—based on application of specific criteria to the record. (5) Thereafter, the City engineer (Peterson) and the public works director (Mull) check to confirm that the subdivision plans comply with the City's drainage standards and any other conditions specified in the approval order. (6) Finally, if there is no appeal from the hearings officer's decision, the community development director signs the final plat for recording to "certify that the final plat * * * conforms to that which was approved by the hearings officer."

Mull testified that, as public works director, he was part of the review team that approved the Country Glen subdivision. He explained that after approval of a subdivision by the City hearings officer, it was his responsibility to "ascertain whether [the design that] the subdivision developer and the developer's engineer are proposing meets the parameters of the land use order and the parameters of the Keizer standards for drainage and building." Mull testified that his office approved the design plans and the final "as-built" plans for Country Glen subdivision, notwithstanding that the elevation of the two southern cul-de-sacs was below the banks of the Labish Ditch and the major outflow drain did not have sufficient "fall" to drain.

Peterson testified that, as City engineer, he also was involved in the review process for the Country Glen subdivision. Peterson stated that a City ordinance required the developer of a subdivision to submit a "separate and distinct" drainage basin analysis for each new subdivision, and the City would not issue any construction permits or sign off on the final plat until his office had reviewed and approved the calculations in the drainage basin analysis. Peterson testified that Russell Faust, a certified engineer employed by Peterson's office, reviewed and approved the drainage basin analysis submitted for the Country Glen subdivision (which was borrowed from an analysis performed on the Labish Ditch basin for Hidden Creek, a previously developed subdivision in the same basin). However, Faust testified—contrary to Peterson—that he had *never* performed any kind of a review of an analysis or calculations regarding Country Glen Estates or Hidden Creek.

Plaintiffs' closing arguments focused on Peterson and Mull. Plaintiffs, emphasizing Faust's testimony, argued that the City, through Peterson, had negligently failed to review the drainage basin analysis for the Country Glen subdivision for compliance with City standards. Plaintiffs further argued that the City, through Mull, was responsible for checking the layout and elevations of the drains to be sure that they would function correctly, but had failed to do so. Plaintiffs adduced no evidence, and made no argument, that the hearings officer's initial approval was negligent or was, in any way, the basis of liability.

Given the foregoing, we are persuaded that the object of plaintiffs' negligence claim was Peterson's and Mull's conduct—and not, as the City argues, the hearings officer's initial approval. Indeed, the record demonstrates that the hearings officer's threshold approval of the subdivision application was completely distinct from the subsequent review and approval of the subdivision design plans by the city engineer and public works director. *See* 169 Or App at 517-18.

■ Thus, the discretionary immunity issue reduces to whether Peterson's and Mull's failure to review the design plans and drainage basin calculations was "discretionary" as a matter of law. *See Sager v. City of Portland*, 68 Or App 808, 812, 684 P2d 600, *rev den* 298 Or 37 (1984) ("[W]hether governmental immunity bars a claim is a question of law.").[6] For the following reasons, we conclude that that conduct did not involve the exercise of discretion.

■ In *McBride v. Magnuson*, 282 Or 433, 436-37, 578 P2d 1259 (1978), the Supreme Court explained the concept of "discretion" for purposes of immunity under ORS 30.265:

"It depends on the kind of judgments for which responsibility has been delegated to the particular officer. Discretion, as this court has noted in other contexts, involves 'room for policy judgment,' or the responsibility for deciding 'the

[6] Immunity under ORS 30.265(3)(c) is a statutory defense. Consequently, the availability of that defense may turn on questions of statutory construction. Under the rule of prior construction, when the Supreme Court interprets a statute, that interpretation becomes part of the statute as if written into it at the time of its enactment. *See Stephens v. Bohlman*, 314 Or 344, 350 n 6, 838 P2d 600 (1992).

adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued.' It involves the delegated responsibility for 'assessment and ranking of the policy objectives explicit or implicit in the statute' and for the judgment that one or more of these objectives will be served by a given action. In other words, insofar as an official action involves both the determination of facts and simple cause-and-effect relationships and also the assessment of costs and benefits, the evaluation of relative effectiveness and risks, and a choice among competing goals and priorities, an official has 'discretion' to the extent that he has been delegated responsibility for the latter kind of value judgment." (Citations omitted.)

Thus, a "discretionary" decision involves assessment and ranking of policy objectives, and selection of means to achieve a particular end. *See Mosley v. Portland School Dist. No. 1J*, 315 Or 85, 91, 843 P2d 415 (1992).

■ This court and the Supreme Court have applied the concept of "discretion" explained in *McBride* on many subsequent occasions. *See, e.g., Mosley*, 315 Or at 93 (a school principal's decisions on the "number and allocation of his security personnel" involved "classic policy choices that are entitled to discretionary immunity"); *Vokoun v. City of Lake Oswego*, 169 Or App 31, 7 P3d 608 (2000) (city's policy choice not to use its limited revenues for storm water management to inspect and maintain a certain drainage outfall was entitled to discretionary immunity); *Garrison v. Deschutes County*, 162 Or App 160, 986 P2d 62 (1999), *rev allowed* 329 Or 650 (2000) (county's decision not to install a safety barrier at a garbage transfer station was immune because the county had made the decision based on an informed weighing of risks in light of its objectives). As we recently explained in *Vokoun*, a discretionary decision need not be a choice "to undertake an affirmative act; in some cases, responsible public officials may weigh the policy alternatives and attendant risks and benefits and determine not to take a particular course of action. But what is required is that the public officials make a choice, that is to say, the public officials must exercise their discretion." 169 Or App at 42.

■■ Not all choices between two courses of action involve an exercise of discretion. For example, "the choice to follow or

not to follow a predetermined policy in the face of a particular set of facts * * * normally is not a discretionary policy choice entitled to immunity under ORS 30.265(3)(c)." *Mosley*, 315 Or at 92. In a related sense, "routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action," are not immune. *Lowrimore v. Dimmit*, 310 Or 291, 296, 797 P2d 1027 (1990). Thus, in *Lowrimore*, the court held that a deputy sheriff's decision to pursue a vehicle driven by a criminal suspect was not immune because "the decision itself [was] not a policy judgment." *Id.* at 296. That was so because, while the decision to pursue might have been made *pursuant* to a county departmental policy, it ultimately involved an application of existing policy to certain facts.[7]

■ Applying those principles here, we conclude that, in this case, the City engineer's and the City public works director's functions—review of the drainage basin analysis and design plans submitted by the developer for compliance with the conditions of approval specified in the hearing officer's order—did not involve the exercise of discretion. The language in the hearings officer's approval order is mandatory:

"(2) The applicant shall submit an engineering site plan to the Keizer Department of Public Works [and the Keizer Community Development Department] for its review and approval. The site plan shall include information concerning storm water detention, street improvements, easements, sewer, water and other engineering information as necessary to show compliance with Public Works development standards. Additional requirements are attached as Exhibit 'C' and Exhibit 'D' and are by reference included in this condition * * *."

---

[7] Similarly, in *Brennen v. City of Eugene*, 285 Or 401, 591 P2d 719 (1979), the court held that a city employee's decision to license a cab company that did not have the amount of liability insurance required by statute was not immune under ORS 30.265(3). The court explained that

"although the decision to issue the license, in the abstract, may or may not have required discretion, the only duty of the agent regarding the liability insurance was to compare the facts stated in the application with the requirements of the ordinance." *Brennen*, 285 Or at 416.

*See also Mosley*, 315 Or at 90 (noting that in *Brennen*, "the decision to issue a license did not involve any discretion at all").

Exhibit "C," in turn, provided, *inter alia*, that:

> "A storm drainage master plan shall be submitted to the Public Works Department for approval prior to construction of any phase of the project."

Finally, the order stated that:

> "[The above conditions] *shall be completed, including review and approval by the appropriate department,* prior to issuance of a building permit for any one building." (Emphasis added.)

Thus, both Peterson and Mull had nondiscretionary duties to review the engineering site plan and drainage master plan for the Country Glen subdivision.[8] Failure to perform a mandatory duty is not the product of an exercise of discretion. *See, e.g., J. Gregcin, Inc.*, 39 Or App at 747 ("The city's failure properly to perform its statutory duty was not a product of discretion.").

Moreover, Peterson's and Mull's only duties with respect to the Country Glen subdivision involved comparing the plans submitted by the developer to the conditions prescribed in the hearings officer's order, and either approving or denying the plans accordingly. Their approval or denial of a plan did not involve "room for policy judgment," or a "delegated responsibility for 'assessment and ranking of the policy objectives * * *' and for the judgment that one or more of these objectives will be served by a given action." *McBride*, 282 Or at 437. Rather, it entailed applying existing policy, *viz.*, the conditions and design standards specified in the hearings officer's order, to a particular set of facts.

In sum, regardless of whether Peterson's and Mull's conduct is viewed as an omission (failure to review the plans

---

[8] It is not entirely clear from the record whether the "drainage master plan" is the same as, or in addition to, the "drainage basin analysis" that Peterson referred to in his testimony. *See* 169 Or App at 517 ("A City ordinance required the developer of a subdivision to submit a 'separate and distinct' drainage basin analysis for each new subdivision, and the City would not issue any construction permits or sign off on the final plat until his office had reviewed and approved the calculations in the drainage basin analysis."). Regardless, Peterson's review and approval of the "storm drainage master plan" was mandatory under the hearings officer's order, and his review and approval of the "drainage basin analysis" was, according to Peterson, mandated by a City ordinance.

for compliance with conditions of approval) or as an act (approval of the plans without proper review), that conduct did not involve the exercise of discretion. Peterson's and Mull's approval of the subdivision plans without reviewing them for compliance with the hearing officer's order and mandatory standards was neither a discretionary decision not to take an affirmative action nor a policy-making decision. Accordingly, we conclude that the court did not err in denying the City's motion for a directed verdict on its defense of discretionary immunity.

The City raises a bevy of other assignments of error, which, if successful, would result in outright reversal rather than remand for a new trial. We have considered, and reject without further discussion, the City's third, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, and thirteenth assignments of error.

■ We proceed to the City's twelfth assignment of error, which asserts that the court erred in giving plaintiffs' requested "less satisfactory evidence" instruction. We agree that the court erred in giving that instruction and further conclude that that error was not harmless.

We begin, necessarily, by "setting the scene"—by placing the challenged instruction in its evidentiary and procedural context: In general, the instruction pertained to the City's alleged failure to present certain evidence on the critical issue of the foreseeability of flooding. In attempting to establish that the City knew that there was a risk of flooding from Labish Ditch and reasonably should have foreseen the danger to plaintiffs' homes, plaintiffs offered both lay and expert testimony. The lay witnesses were three local residents who testified that they had seen standing water and flood waters on the property in the past.

Plaintiffs' expert witness was Gary Bliss, a civil engineer specializing in hydrology, whom plaintiffs retained to assess the development and engineering of the Country Glen subdivision. Bliss testified that, as part of his research into the drainage plan for the Country Glen subdivision, he reviewed several maps, including a 1978 map that indicated that the area of the Labish Ditch in question was in a 100-year flood plain. Bliss also testified that he had reviewed

a 1985 map of the City of Keizer that was developed with funds from the Federal Emergency Management Agency (FEMA). That map was the most current "Flood Insurance Rate Map" (FIRM) when the City approved the Country Glen subdivision in 1993.[9] The 1985 FIRM map, Bliss's interpretation of that map, and the City's response (or alleged lack of response) to that interpretation lie at the heart of the parties' dispute regarding the "less satisfactory evidence" instruction.

The Labish Ditch flows from east to west.[10] On the 1985 FIRM map, the land on either side of the Labish Ditch east of the Country Glen development site is shaded, to indicate that it is in a 100-year flood plain. To the west of that shading, the land alongside the Labish Ditch—where Country Glen Estates was eventually located—is not shaded to indicate a flood plain. Between the shaded and unshaded areas, the words "Limit of Study" appear next to an arrow indicating the point on the Labish Ditch where the flood plain shading stops. Bliss testified that the 1985 FIRM map did not make it clear whether the lack of shading and "Limit of Study" disclaimer meant that the portion of the Labish Ditch where Country Glen was developed had *not* been studied, or whether it *had* been studied and simply was not in a flood plain. Nevertheless, in Bliss's opinion, the flood plain shaded on the map, when considered together with the westerly flow of the Labish Ditch, the topography of the land and the prior 1978 map, demonstrated that, during a 100-year flood, water from the shaded flood plain shown on the map could only flood west down the Labish Ditch towards the Country Glen subdivision. Thus, Bliss testified, he understood the phrase "Limit of Study" to mean that the portion of the Labish Ditch where Country Glen Estates was eventually situated had *not* been studied. Bliss also testified that, given the information

---

[9] The City of Keizer flood plain overlay zone ordinance defines a FIRM map as "the official map on which the Federal Insurance Administration has delineated both the areas of special flood hazards (flood plain) and the risk premium zones applicable to the community and is on file with the City of Keizer."

[10] We note, parenthetically, that the record rather cryptically suggests that somewhere to the west of the subject area the water in the Labish Ditch flows from west to east.

on the 1985 FIRM map, he would not, as an engineer, have signed off on development of the Country Glen subdivision.

Central to the City's defense on foreseeability and, particularly, its response to Bliss's testimony—was the testimony of Peterson, the City engineer.[11] Peterson testified that he had no reason to know that the Country Glen subdivision area near the Labish Ditch was at risk of flooding. In particular, he stated that he had checked the 1985 FIRM map to see if the proposed Country Glen subdivision was in a floodplain and that he had reasonably concluded that it was not. On cross-examination, plaintiffs' attorney asked Peterson if he had been involved in a 1993 revision of the FIRM map. Peterson responded that he believed he had some "preliminary involvement," but that he was "not specifically" involved with "any meetings or review of any maps that pertained to the Labish Ditch."

The City also offered the testimony of Ted Cassidy, an engineer with extensive experience with FIRM flood plain designations, who testified that the 1985 FIRM map clearly indicated that the area of the Labish Ditch in question was *not* in a flood plain. Cassidy further testified that, given all the information available, a reasonable and prudent engineer could only conclude that the stretch of the Labish Ditch in question *had* been studied, that it was *not* in a flood plain, and that the 1985 FIRM map superseded all "bad information from prior studies."

With the evidentiary scene thus set—and before closing argument—plaintiffs requested, and the court agreed to give, the "less satisfactory evidence" instruction.[12] That instruction states:

> "In evaluating the evidence you may consider the power of each side to produce evidence. If weaker and less satisfactory evidence is offered by any party, when it appears to you that stronger or more satisfactory evidence was in the

---

[11] The City also presented lay testimony by several local farmers, rebutting plaintiffs' lay evidence, to the effect that they had never seen Labish Ditch flood the area before 1996.

[12] Because counsel's discussion with the court regarding the "less satisfactory evidence" instruction occurred in chambers, we have no record of the court's reasoning.

power of that party to produce, the evidence offered should be viewed with distrust." *See* ORS 10.095(8).

During closing argument, plaintiffs' attorney used that instruction to attack Peterson's testimony that he (Peterson) understood the 1985 FIRM map to cover the stretch of the Labish Ditch in question and therefore reasonably concluded that the Country Glen subdivision lots near the Labish Ditch were *not* in a flood plain. Specifically, plaintiffs' attorney argued that the jury should view with distrust Peterson's testimony regarding his understanding of the 1985 FIRM map, because: (1) Peterson had attended meetings "with the officials from FEMA" regarding a 1993 modification of the FIRM map for the Keizer area; and (2) notes from those 1993 meetings would be better evidence than Peterson's testimony of what, in fact, he knew about the 1985 map and whether the stretch of the Labish Ditch in question was in a flood plain:

> "I want to talk about some issues concerning less satisfactory evidence, if you will. These—these defendants all take the position that the maps that were in use and being regulated from were somehow carved out—represented a full study of the entire area. And FEMA studied this area in question. You recall questions of Mr. Peterson about his participation in the modification process * * *. There are two specific dates * * * at which he was present with city officials, with officials from FEMA, in which all the review was being made to ascertain how they were going to change matters. Does he come forward with any notes from those meetings? Does he come forward with any—any maps from those meetings to show what, in fact, was done, to show what his knowledge may have been? No. Absolutely not. He doesn't have it anymore.
>
> "He fails to come forward with the satisfactory evidence to show what, in fact, occurred, what, in fact, was studied at this time. And the Court will have an instruction for you relating to such less satisfactory evidence."

When the court invited exceptions to instructions, the City's counsel excepted to the "less satisfactory evidence" instruction, specifically noting plaintiffs' counsel's emphasis of that instruction:

"[T]he argument was made concerning [Mr. Peterson's failure] to bring forth any minutes or documents for meetings with FEMA. Those kinds of materials were easily or equally accessible to [plaintiffs' counsel] through a subpoena to FEMA should he believe that such things existed. [This instruction should] be given when one party has exclusive possession or control of evidence and it's not brought forth."

On appeal, the City asserts, and plaintiffs dispute, that the trial court erred in giving the "less satisfactory evidence" instruction because the basic foundational requirements described in *Whaley v. Russell Stover*, 44 Or App 541, 543, 606 P2d 667 (1980), were not satisfied. We agree with the City.

■ In *Whaley*, we outlined the foundational requirements that must be met for the giving of the instruction to be proper:

"This statutory instruction need not be given routinely merely because it is requested. The proper occasion for the instruction is a situation where the basis for the instruction is found in the evidence. * * * *The party requesting the instruction must show, and the court must find, that other evidence was reasonably available on a fact in issue and that there is a basis for the jury to conclude the other evidence is stronger and more satisfactory than the evidence offered.*" 44 Or App at 543-44 (citations omitted; emphasis added).

The Supreme Court has since reiterated the foundational requirements described in *Whaley*. In *State v. McDonnell*, 313 Or 478, 837 P2d 941 (1992), the defendant argued on appeal that the trial court had erred in not in giving the "less satisfactory evidence" instruction. Citing *Whaley*, the Court rejected the defendant's argument on the ground that

"nothing in the record suggests that the state had any other evidence that it did not offer concerning the search for the murder weapon or defendant's clothing, or that the state could have obtained additional admissible evidence and simply failed to do so. The record therefore does not support the giving of the requested instruction." *McDonnell*, 313 Or at 503.

*See also Lakin v. Senco Products, Inc.*, 144 Or App 52, 65, 925 P2d 107 (1996), *aff'd* 329 Or 62, 987 P2d 463 (1999) (reciting *Whaley* foundational requirements).

The City argues that the record here does not support the giving of the "less satisfactory evidence" instruction, because plaintiffs failed to demonstrate that the "other evidence"—notes from the 1993 FIRM revision meetings—was "reasonably available." We agree.

The only evidence of Peterson's involvement with the 1993 FIRM revision meetings was the following exchange between counsel for plaintiffs and Peterson:

"[Counsel]: And as far as the FIRM map revision in 1995, in and around 1993 were you involved in any of that process where that FIRM map was in fact changed?

"* * * * *

"[Peterson]: Yeah, I believe that we ha[d] some preliminary involvement * * *.

"[Counsel]: But in that process of revising the FIRM map, were you involved in any meetings or did you review any maps that pertained to the Labish Ditch in any way?

"[Peterson]: Not specifically."

Nothing in the record establishes the actual existence of any notes from any of the meetings in question, much less that the City had possession of, or ready access to, any such notes. Plaintiffs failed to demonstrate that the notes from the FEMA meetings were "reasonably available," as required by *Whaley*.

Plaintiffs argue, nevertheless, that, because Peterson testified that the City had been involved in the meetings to revise the FIRM maps, "the jury was entitled to infer that there was some type of documentary evidence of these meetings." That argument fails. *Whaley*'s foundational requirement is explicit: "The party requesting the instruction *must show*, and the court must find, *that [the] other evidence was reasonably available * * *.*" 44 Or App at 543-44 (emphasis added). Again, the mere fact that the FIRM map revision meetings occurred in 1993 does not "show" that any notes from those meetings were ever generated, much less that

they still existed at the time of trial and were reasonably available to the City. We thus conclude that the trial court erred in giving the jury the "less satisfactory evidence" instruction.[13]

 Instructional error is not necessarily reversible error. We will reverse a judgment on the basis of an improper jury instruction only if we "can fairly say that the instruction probably created an erroneous impression of the law in the minds of the [jurors] which affected the outcome of the case." *Waterway Terminals v. P.S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970). In assessing the likely impact of an erroneous instruction, "we must presume that the jury followed the court's instruction." *Fulton Ins. v. White Motor Corp.*, 261 Or 206, 223, 493 P2d 138 (1972).

Here, the City argues that the trial court's giving of the "less satisfactory evidence" instruction, "coupled with the plaintiffs' use of the instruction during their closing statement," likely affected the outcome of the case.[14] We agree for two related reasons. First, the combined effect of the erroneous instruction and plaintiffs' closing argument emphasizing that instruction was that the jury understood that it should view Peterson's representations about his understanding of the 1985 FIRM map's coverage "with distrust." Thus, the instruction "probably created an erroneous impression of the law in the minds of the [jurors]." *Waterway Terminals*, 256 Or at 370.

Second, that erroneous impression of the law distorted the jury's consideration of a central, and vehemently disputed, issue in the case. Peterson's testimony that he understood the 1985 FIRM map to indicate that the area was

---

[13] Plaintiffs also attempt to justify the trial court's giving of the "less satisfactory evidence" instruction on the basis that one of codefendant Multi/Tech's expert witnesses performed an inadequate stream flow analysis and consequently "missed and ignored critical data reducing his flow amounts." According to plaintiffs, the "less satisfactory evidence" instruction was appropriate with respect to the expert's testimony because he had the "ability and means to conduct a proper measurement." That argument fails because, as the City observes, "plaintiffs * * * fail to point to testimony demonstrating that there were other measurements reasonably available [and] plaintiffs never contended that other measurements were available, yet not placed into evidence."

[14] Plaintiffs do not offer any argument that the instruction, if error, was harmless.

*not* in a flood plain lay at the core of the City's defense on foreseeability. Given the importance of Peterson's testimony to the central issue of foreseeability, and the potential impact of the erroneous instruction on the jury's assessment of that critical testimony, we conclude that the error in giving the "less satisfactory evidence" instruction was not harmless. Accordingly, we reverse and remand for a new trial.[15]

Our disposition of the appeal moots plaintiffs' cross-appeal.

Reversed and remanded for a new trial; cross-appeal dismissed as moot.

---

[15] Given that disposition, we do not address the City's remaining assignments of error, which are unlikely to recur on retrial.