Argued and submitted September 24, 2001, reversed and remanded in part; otherwise affirmed February 6, 2002

Ruth Thomas RAMIREZ,
*Appellant,*

*v.*

HAWAII T & S ENTERPRISES, INC.,
a Hawaii corporation;
and City of Portland,
*Respondents.*

9808-06383; A110037

39 P3d 931

J. Michael Mattingly argued the cause for appellant. With him on the brief was Seidl & Rizzo, LLP.

Thomas W. Sondag argued the cause for respondent Hawaii T & S Enterprises, Inc. With him on the brief was Lane Powell Spears Lubersky LLP.

Harry Auerbach, Senior Deputy City Attorney, argued the cause and filed the brief for respondent City of Portland.

Before Wollheim, Presiding Judge, Deits, Chief Judge, and Schuman, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

Plaintiff fell and fractured her ankle after stepping on a broken curb at a downtown Portland intersection. She sued the City of Portland (the city) and the owner of the adjacent property, Hawaii T & S Enterprises, Inc. (T & S). Both defendants moved for summary judgment. The city maintained that it was immune from liability under the Oregon Tort Claims Act. T & S argued that the ordinance on which plaintiff based what she called a "statutory tort" claim does not apply under the facts of this case, and, if it does, it violates the Portland City Charter and is therefore void. The trial court granted both defendants' motions and dismissed plaintiff's claims. Plaintiff appeals. We affirm the grant of summary judgment in favor of the city, reverse the grant of summary judgment to T & S, and remand.

## I. CLAIMS AGAINST THE CITY

Plaintiff bases her claims against the city on the city's failure to inspect, maintain, and repair the curb, despite a city policy calling for inspections every two years. The city invokes the protection of ORS 30.265(3)(c), a provision of the Oregon Tort Claims Act that immunizes public bodies and their employees from liability for "[a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." The city bears the burden of proving that it qualifies for this immunity. *Stevenson v. State of Oregon*, 290 Or 3, 15, 619 P2d 247 (1980). On review of the trial court's grant of the city's summary judgment motion, we will affirm only if we conclude that the undisputed facts, including those contained in supporting affidavits and not contradicted by counter-affidavits, establish that the city prevails as a matter of law. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997); *Comley v. State Bd. of Higher Ed.*, 35 Or App 465, 469, 582 P2d 443 (1978). We view the record in the light most favorable to plaintiff, giving her the benefit of every favorable inference that may be drawn from it. ORCP 47 C; *Sager v. City of Portland*, 68 Or App 808, 811, 684 P2d 600, *rev den* 298 Or 37 (1984).

■ One of the more succinct formulations of the distinction between immune and nonimmune actions under the doctrine of discretionary immunity is this: Discretionary immunity applies to actions that embody "a choice among alternative public policies by persons to whom responsibility for such policies have been delegated." *Miller v. Grants Pass Irrigation District*, 297 Or 312, 316, 686 P2d 324 (1984). This statement identifies three criteria that a government function or duty must meet in order to qualify for discretionary immunity. It must be the result of a *choice*, that is, the exercise of judgment; that choice must involve public *policy*, as opposed to the routine day-to-day activities of public officials; and the public policy choice must be exercised by a body or person that has, either directly or by delegation, the *responsibility* or authority to make it.

■ First, a discretionary action requires the exercise of judgment, as opposed to the mere implementation of a judgment made by others. *McBride v. Magnuson,* 282 Or 433, 437, 578 P2d 1259 (1978). Judgment may be a decision to pursue a particular objective, a choice among different objectives, or a choice of means to accomplish an objective. *Id.* Thus, for example, if

> "officials had determined * * * that their budgets would not permit them to provide all the desirable safety features and that the public would be better served by facilities other than cattle guards or median barriers, that would constitute the immune exercise of governmental discretion. If, on the other hand, they had decided to install cattle guards or median barriers wherever certain kinds of conditions existed and the failure to install them in a particular location was the result of a failure to determine that those conditions did in fact exist at that location, no exercise of judgment about governmental policy would be involved." *Stevenson,* 290 Or at 14-15.

Likewise, if a city's decision not to build a particular project causes property damage, the city is immune from liability for the damage if its inaction resulted from adoption of a "prioritized * * * list of capital improvement projects" that did not include the one that would have prevented the damage; it would not be immune if, having decided to build the project, it did so negligently. *Vokoun v. City of Lake Oswego,* 169 Or

App 31, 42-43, 7 P3d 608 (2000), *rev allowed* 331 Or 633 (2001). A city would be immune from liability for damages caused by its decision not to adopt a taxi licensing system, but it is not immune when, having adopted a policy requiring taxi drivers to meet certain criteria before obtaining a license, one of its employees licenses a taxi driver who does not qualify, and as a result that driver causes harm. *Brennan v. City of Eugene*, 285 Or 401, 416, 591 P2d 719 (1979); *accord Hutcheson v. City of Keizer*, 169 Or App 510, 521-22, 8 P3d 1010 (2000) (no immunity from consequences of issuing approval to subdivision that did not meet established criteria). The operative distinction, then, is between choosing a course of action or inaction, on the one hand, and putting that choice into effect, on the other.

■ Second, the judgment must involve public policy, which is to say that it generally must take place at a relatively high level of public authority; the "routine decisions which every employee must make," even when they require judgment, do not qualify for discretionary immunity. *Stevenson*, 290 Or at 14. Thus, even though a police officer's decision to engage in a high-speed chase involves the exercise of judgment, that action is not immune from liability for the ensuing harm it causes, because the decision is a routine, day-to-day judgment and not a public policy choice. *Lowrimore v. Dimmitt*, 310 Or 291, 296, 797 P2d 1027 (1990).

■ Third, the policy choice must be exercised by someone with authority to do so. *Miller*, 297 Or at 316. For example, it is unlikely that either the state or a prison correctional officer it employs would be immune from liability for the consequences of an unauthorized decision by the officer to release some category of offenders, while both the employee and the state would probably be immune if the release occurred pursuant to a duly enacted statute.

■ Despite those general guidelines, the volume of litigation revolving around ORS 30.265(3)(c) and the common-law doctrine it codified demonstrates that the identification of discretionary functions and duties can be "notoriously obscure and difficult." *Miller*, 297 Or at 320. This case, however, is relatively simple. The city argues that its diversion of

limited resources from sidewalk inspection to the more pressing needs occasioned by the floods of February 1996 was a discretionary action. We agree.

Because a given action can be discretionary or non-discretionary depending on the circumstances surrounding the decision to take it or not, *Ramsey v. City of Salem*, 76 Or App 29, 31, 707 P2d 1295 (1985), we describe the background of the city's decision.

The Portland City Council established a Bureau of Maintenance (bureau). Within the bureau, the Sidewalk Section of the Transportation Operations Division is responsible under the City Code for inspecting, maintaining and repairing sidewalks and curbs. The bureau receives a budget allocation from the city council with a line item for the Sidewalk and Preservation Program, but the director of the bureau has authority to allocate funds among different programs within the bureau as contingencies may require.

The Sidewalk Program is described in a publication entitled *Sidewalk Maintenance Program Policy and Operating Guidelines*, promulgated by the Bureau of Maintenance, Office of Transportation. Two of the program's "goals" are to "protect the general public from injury by identifying hazards and ensuring their timely removal" and to "protect individual property owners by notifying them that a hazardous condition exists." *Id.* at 1-2. In order to achieve that goal, the bureau has developed "operating policies," one of which is: "To ensure pedestrian safety, inspect all neighborhood sidewalks once every 10 years, and sidewalks in the Central Business District once every 2 years." *Id.* at 3.

In February 1996, the city council authorized the director to use some of his employees who were normally sidewalk and curb inspectors to undertake other, more urgent tasks to deal with the consequences of a serious flood that caused the Willamette River to overflow. For the remainder of the spring, crews from the Sidewalk Repair Section were frequently diverted from inspection activities to flood-related emergency activities. Plaintiff's injury occurred on September 1, 1996. At that time, the cracked curb she fell on had not been inspected for more than two years.

From those facts, taken from uncontradicted affidavits, we readily conclude that the decision to divert city employees from sidewalk inspection duties to flood-related duties was an exercise of discretion as that term is used in ORS 30.265(3)(c). The decision involved the exercise of judgment; in putting flood-related activities before sidewalk inspection, the decision prioritized public services according to perceived needs. That was a high-level decision involving public policy issues, as opposed to a routine, day-to-day choice by a line employee. And the decision emanated from the city council itself, which has the authority to make and to delegate decisions regarding the allocation of city resources. The trial court did not err in granting the city's motion for summary judgment.

## II.   CLAIMS AGAINST T & S

Plaintiff's complaint against T & S originally included claims for negligence and for what she labels "statutory tort." Before this court, she appeals from summary judgment against only the latter, resting her theory on Portland City Code (PCC) 17.28.020. According to plaintiff, that ordinance makes adjacent landowners liable for damages resulting from defective curbs abutting their property regardless of whether the owners have prior notice of the defect. T & S moved for summary judgment on alternative theories: first, that the ordinance does not impose liability under the circumstances of this case, and, second, if it does, it is void because it conflicts with the city charter, which authorizes the city to impose liability on adjacent landowners only after notifying them of needed repairs. The trial court agreed that the ordinance purports to impose liability even in the absence of notice, but held that, in so doing, the ordinance conflicts with the charter. We agree that the ordinance imposes liability without notice in this case but conclude that, in so doing, it does not conflict with the charter.

We begin with an analysis of the ordinance, and we begin that analysis by focusing on its text and context. *Harris v. Sanders*, 142 Or App 126, 130, 919 P2d 512, *rev den* 324 Or 322 (1996). PCC 17.28.020 provides, in part:

"A.   The owner(s) of land abutting any street in the City shall be responsible for constructing, reconstructing,

maintaining and repairing the sidewalks, curbs, driveways and parking strips abutting or immediately adjacent to said land, except as provided in Subsection B. Said property owner(s) shall be liable for any and all damages to any person who is injured or otherwise suffers damage resulting from the defective condition of any sidewalk, curb, driveway or parking strip adjacent to said land, or by reason of the property owner's failure to keep such sidewalk, curb, driveway or parking strip in safe condition and good repair.
\* \* \*

"B. Curbs shall be maintained by the City, except when in combination with the sidewalk and when they have been willfully damaged. Intersection corners and curbs adjacent thereto may be installed by the City when sidewalks and curbs are constructed up to the intersection on the same side of the street."

T & S argues that the first sentence of this ordinance, read in conjunction with Section B, relieves landowners from maintaining and repairing curbs except when the repair is "in combination with the sidewalk" and when the repair is needed because of "willful damage." Because there is no evidence that the curb over which plaintiff tripped needed to be repaired in conjunction with a sidewalk repair, or that the repair was needed because of willful damage, T & S had no responsibility for the curb and therefore cannot be liable for damage it caused.

■ That argument is unpersuasive. First, it presumes that assigning responsibility to the city relieves landowners of that responsibility. That is not necessarily true. Second, T & S reads the phrase "in combination with the sidewalk" as referring to a combined *repair*: Section B, it argues, means, "Curbs shall be maintained by the City, except when [maintained] in combination with [maintenance of] the sidewalk and they [*i.e.*, the curbs] have been willfully damaged." Under a much less strained reading, the phrase "in combination with the sidewalk" refers to a curb-sidewalk combination such as the one at issue in this case; Section B more plausibly means "[c]urbs shall be maintained by the City, except when [the curbs are] in combination with the sidewalk and when they have been willfully damaged." Under that

reading, the city has no responsibility to maintain the curb-sidewalk in this case. Third, even if the curb in this case is the responsibility of the city (and hence, according to T & S, not landowners), Section B assigns the city responsibility only for *maintaining* curbs. Importing that assignment into the text of Section A still leaves the owner responsible for *repairing* curbs. And fourth, even if the first sentence does relieve landowners from all *responsibility* for curbs, the next sentence imposes *liability* on landowners for "any and all" damages caused by the defective condition of "any * * * curb" or by the landowner's "failure to keep such * * * curb in safe condition and good repair." The ordinance by its clear terms makes landowners liable, without notice, for damages caused by their failure to keep adjacent curbs in safe condition, regardless of whether the landowner is responsible for the curb.

That same inclusive language—*all* damages, *any* curbs—also defeats T & S's argument that the second sentence of Section B somehow relieves landowners of liability for injuries caused by curbs adjacent to "intersection corners." Section B does nothing of the sort; it simply authorizes the city to install intersection corners and adjacent curbs in some circumstances. It imposes neither responsibility for the curbs' upkeep nor liability for damages caused by their defects.

T & S next argues that, because the first sentence of Section A imposes a responsibility on adjacent landowners and the second sentence, parallel in structure, imposes a liability on them, "one informs the other"; thus, T & S asserts, the ordinance imposes liability on landowners only when the injury results from their failure to meet their responsibility. Here, "there is no evidence" that plaintiff's injury resulted from any dereliction of duty by T & S; the defects in the curb could have resulted from "weather or automobiles."

That argument is unpersuasive for two reasons. First, the fact that the opening sentence deals with responsibility and the next with liability does not create the inference that the differences between the two sentences are ephemeral and should be ignored. To the contrary, the fact that the ordinance in adjacent sentences creates a clear distinction between responsibility and liability demonstrates that the

drafters intended a difference, not a convergence. Second, even if T & S were correct, the question whether it was responsible for the disrepair of the curb would be an issue of material fact, and by no stretch of the imagination can we say that undisputed facts in the record interpreted in the light most favorable to plaintiff resolve this issue in T & S's favor.

The text of PCC 17.28.020, then, cannot plausibly be read so as to absolve an adjacent landowner in T & S's position from liability for damages caused by failure to repair a defective curb. And although several provisions in the city's code, charter and policy statements call on the city to notify landowners of defective sidewalks or curbs, these requirements do not amount to a "context" that is sufficient to alter the unambiguous and plain statement that

> "property owner(s) shall be liable for any and all damages to any person who is injured or otherwise suffers damage resulting from the defective condition of any sidewalk [or] curb * * *, or by reason of the property owner's failure to keep such sidewalk [or] curb * * * in safe condition and good repair." PCC 17.28.020(A).

T & S would have us insert the phrase "if they have been notified" into the ordinance. That we cannot do. *Harris*, 142 Or App at 130 (applying to ordinances the method of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993), which, in turn, incorporates ORS 174.010, enjoining courts "not to insert what has been omitted").

We turn, then, to the question whether this ordinance conflicts with the city's charter. Some general considerations guide our inquiry. A city's charter is its constitution; it defines and limits the legislative authority of the city, and, therefore, "any city ordinance, rule, or regulation in conflict with its provisions is void." *Portland Police Assn. v. Civil Service Board*, 292 Or 433, 440, 639 P2d 619 (1982). However, Portland's charter itself requires that, if possible, conflicts should be resolved so as to enable, and not restrict, the legislative authority of the city council. Section 13-201 of the Portland City Charter provides:

> "Any restriction or limitation imposed on the authority of the Council by Charter provision, applies only as its language *explicitly and necessarily* requires. *Simultaneous or*

*subsequent specification of authority is not exclusive* and does not impair other or general authority and power granted by existing or future Charter provisions[.]" (Emphasis added.)

In light of those precepts, we cannot conclude that PCC 17.28.020 conflicts with Section 9-408, which provides:

"Owners of land within the City are liable for all damages resulting from their failure to put an adjoining sidewalk in repair after notice to repair as provided in this Article. No action shall be maintained against the City by or for any person injured because of any sidewalk defect."

The essence of T & S's argument is that, "[u]nder the City's charter, a property owner is liable for an injury caused by a defect in an adjacent sidewalk only if the owner previously received notice of the defect and failed to repair it," and thus, by enacting an ordinance that imposes liability when the owner has not received notice, the council exceeded its authority.

If, in fact, section 9-408 announced what T & S alleges—that the owner is liable *only* after notice—then its argument might have some validity. In that case, section 9-408 would declare that notice was a necessary precondition of liability: no notice, no liability. The operative word, however, would be *only*, which does not appear in the actual text and which we are powerless to insert. *Harris*, 142 Or App at 130. Without the word *only*, section 9-408, read as required by section 12-201—that is, finding limitations on city council only if the language of the charter explicitly and necessarily declares them—simply means that a landowner with notice must be liable, leaving the council with the discretion to make other landowners liable as well in the exercise of its general authority to exercise "all governmental powers." PCC 1-102. In other words, section 9-408 declares that owners who receive notice are liable and the city is powerless to immunize them by ordinance; notified owners constitute a minimum set of owners who are liable. But without the word *only*, section 9-408 does not establish a maximum set of owners on whom the city *may* impose liability. Thus, PCC 17.28.020 is not in conflict with section 9-408, and it is in harmony with section 1-102. *Cf. State ex rel Haley v. City of*

*Troutdale,* 281 Or 203, 210-11, 576 P2d 1238 (1978) (city ordinance imposing more stringent requirements than state regulation not incompatible with it; state regulation sets minimum, city may impose additional requirements).

T & S maintains that, in adding unnotified owners to the pool of those on whom liability may be imposed, the city expanded upon its express powers, contrary to the dictate announced by the Supreme Court in *Harder v. City of Springfield,* 192 Or 676, 683, 236 P2d 432 (1951): A city "cannot, by enacting a general ordinance, * * * enlarge, restrict or repeal the express substantive provisions of its charter." The full sentence from *Harder,* however, is: "[A city] cannot, by enacting a general ordinance *of 'methods and procedures' such as Ordinance No. 905,* enlarge, restrict or repeal the express substantive provisions of its charter." (Emphasis added.) The case, in other words, stands for the proposition that government may not expand a substantive enactment by a procedural one. That rule is simply inapposite here.

T & S also cites *Oliver v. Hyle,* 14 Or App 302, 513 P2d 806 (1973), for the proposition that a city may not "enlarge" a charter provision. In *Oliver,* the plaintiffs challenged an ordinance purporting to permit the city to discontinue water services to present tenants occupying property where the former tenants had left unpaid water bills. The literal terms of the charter permitted such action. The court, in order to avoid holding the charter unconstitutional as a violation of the Due Process and Equal Protection Clauses, construed it so that "it *only* provides for termination as to the water *consumer* who is in arrears." *Oliver,* 14 Or App at 312 (emphasis added to "only"; emphasis on "consumer" in original). The court cited *Harder* in passing but decided the case on the grounds that the charter, as construed, made the ordinance void. The critical difference between *Oliver* and this case, of course, is that the charter provision in *Oliver,* as construed, contained the word "only" and therefore expressly prohibited the city from doing what its ordinance permitted. *Oliver* does not help T & S here.

Finally, even if we could read section 9-408 to mean that the city's authority to impose liability extended only to notified landowners, T & S cannot overcome a more obvious

obstacle. Section 9-408 would impose that limitation with respect to liability for damages resulting from unnotified landowner's "failure to put an adjoining *sidewalk* in repair after notice[.]" (Emphasis added.) Plaintiff alleges injury caused by a curb, not a sidewalk. The two terms are obviously distinct; PCC 17.28.020, for example, refers to "sidewalks and curbs" as different things no fewer than nine times. PCC 17.28.010, in fact, defines "sidewalk" as:

> "[S]treet area or a portion thereof intended for the use of pedestrians. * * * [F]or purposes of this chapter, 'sidewalk' is that part of a street on the side thereof intended for the use of pedestrians, improved by surfacing."

That definition does not describe a curb.

Thus, we hold that PCC 17.28.020 does not conflict with section 9-408 of the Portland City Charter and is not therefore void.

Reversed and remanded as to defendant Hawaii T & S Enterprises, Inc.; otherwise affirmed.