Argued and submitted June 15, affirmed November 3, 2010

COLUMBIA RIVERKEEPER,
Columbia River Business Alliance,
Oregon Chapter Sierra Club,
Columbia River Clean Energy Coalition,
Jack Marincovich,
and Peter Huhtala,
*Respondents,*

*v.*

CLATSOP COUNTY,
*Respondent below,*

*and*

NORTHERNSTAR ENERGY, LLC;
and Bradwood Landing, LLC,
*Petitioners.*

Land Use Board of Appeals
2009100; A145336

243 P3d 82

Michelle Rudd argued the cause for petitioners. With her on the brief for petitioner NorthernStar Energy LLC were James N. Westwood and Stoel Rives LLP.

Carrie A. Richter and Garvey Schubert Barer filed the brief for petitioner Bradwood Landing, LLC.

Brett VandenHeuvel argued the cause for respondents. With him on the brief were Columbia Riverkeeper and Courtney Johnson, Christopher Winter, and Crag Law Center.

Before Landau, Presiding Judge, and Ortega, Judge, and Sercombe, Judge.*

SERCOMBE, J.

---

* Sercombe, J., *vice* Carson, S. J.

## SERCOMBE, J.

Intervenors Bradwood Landing LLC and NorthernStar Energy LLC applied to Clatsop County for land use approvals that were necessary to construct and operate a liquefied natural gas (LNG) terminal and a natural gas pipeline to serve the terminal. In March 2008, the county adopted an ordinance that enacted the zone and comprehensive plan map amendments and related development approvals needed to facilitate the projects. Petitioners, various organizations and individuals opposed to the amendments and approvals, appealed the ordinance to the Land Use Board of Appeals (LUBA) on a number of grounds. LUBA sustained two of the assignments of error, remanding the ordinance to the county for further findings on the application of three comprehensive plan policies that were approval standards for the requested rezonings. *Columbia Riverkeeper v. Clatsop County*, 58 Or LUBA 190 (2009) (*Bradwood I*).

On remand, the county readopted the ordinance with supplemental findings. After another appeal by petitioners, LUBA determined that the county again misconstrued the meaning of the plan policies and remanded the rezonings to the county for further deliberations. *Columbia Riverkeeper v. Clatsop County*, ___ Or LUBA ___ (LUBA No. 2009-100, Apr 12, 2010) (*Bradwood II*). Intervenors seek review of LUBA's opinion and order in *Bradwood II*, contending that LUBA erred in its construction of the plan policies and in failing to defer to the county's interpretation of those policies under ORS 197.829. We review whether the LUBA order is "unlawful in substance" under ORS 197.850(9)(a) and affirm.

## I.  BACKGROUND

The proposed development is described in *Bradwood I*:

"The proposed site is located approximately 20 miles east of the City of Astoria at the former mill site and company town of Bradwood. The subject property consists of nine parcels totaling 411 acres with over a mile of frontage on the Columbia River. The subject property has upland forested areas and lowlands consisting mostly of estuarine shore lands and wetlands that adjoin the Columbia river where

the proposed terminal would be located. The only structures currently on the property are an abandoned pole barn and a small concrete building.

"The proposed terminal site is 38 river miles from the Pacific Ocean and lies at the junction of the main channel of the Columbia River and Clifton Channel, a large side channel navigable by small watercraft. The proposal calls for large, ocean-going vessels to transport LNG to the terminal, where the LNG will be temporarily stored and then regasified before being sent out by pipeline. The proposed underground pipeline would extend south and east from the terminal for 36 miles and thence under the Columbia River to connect with an interstate natural gas pipeline near Longview, Washington. The first six miles of underground pipeline would be in Clatsop County.

"The proposed development involves a variety of land uses and activities and the county's decision includes numerous comprehensive plan amendments, zone changes, and development approvals that include: a bridge replacement, concrete batch plants, a construction worker park-and-ride facility, dredging of the Columbia River and disposal of the dredged materials, power lines, in-water facilities, storage and staging areas, LNG storage tanks and gasification plant, underground pipeline, railroad realignment, and road improvements."

58 Or LUBA at 192-93.

As part of the terminal project, intervenors propose to dredge 46.4 acres in the Clifton Channel of the Columbia River to provide a turning basin for large container ships. Intervenors applied to amend the Clatsop County Comprehensive Plan (CCCP) designation for this area from "Conservation—Other Resource" to "Development" and to change its zoning from "AC-2 (Aquatic Conservation-2)" to "AD (Aquatic Development)." The current AC-2 zoning does not allow dredging, except in limited circumstances not applicable in this case. Intervenors also sought zone changes and comprehensive plan amendments in three areas on the shoreland from "natural" to "development" designations to allow deposit of dredging spoils and construction of facilities related to the terminal.

The project site consists, in part, of estuarine shoreland adjacent to the Columbia River and is part of the Columbia River Estuary planning area identified in the CCCP. *See Bradwood II*, ___ Or LUBA at ___ (slip op at 15). Statewide Planning Goal 16 (Estuarine Resources), OAR 660-015-0010(1), sets out policies for the regulation of development that affects estuaries. Statewide Planning Goal 17 (Coastal Shorelands), OAR 660-015-0010(2), contains related policies for the regulation of shorelands adjacent to estuaries. The CCCP implements those statewide planning goals in its section setting out the Columbia River Estuary Land and Water Use Plan. ORS 197.175(2)(a) requires counties to adopt comprehensive plans "in compliance with goals approved by [the Land Conservation and Development Commission]."

Under Clatsop County Land and Water Development and Use Ordinance (LWDUO) 5.412(1), a proposed zone change must be determined to be consistent with comprehensive plan policies.[1] Over the course of the proceedings, the issues have narrowed to whether the proposed zone changes comply with two sets of plan policies: (1) a group of policies that limit development "at Bradwood" to that which is "small or moderate" in scale; and (2) two policies that "protect"

---

[1] LWDUO 5.412 requires findings with respect to zone changes that:

"(1) The proposed change is consistent with the policies of the Clatsop County Comprehensive Plan.

"(2) The proposed change is consistent with the statewide planning goals (ORS 197).

"(3) The property in the affected area will be provided with adequate public facilities and services * * *.

"(4) The proposed change will insure that an adequate and safe transportation network exists to support the proposed zoning and will not cause undue traffic congestion or hazards.

"(5) The proposed change will not result in over-intensive use of the land, will give reasonable consideration to the character of the area, and will be compatible with the overall zoning pattern.

"(6) The proposed change gives reasonable consideration to peculiar suitability of the property for particular uses.

"(7) The proposed change will encourage the most appropriate use of land throughout Clatsop County.

"(8) The proposed change will not be detrimental to the health, safety and general welfare of Clatsop County."

*See Bradwood I*, 58 Or LUBA at 217 n 16.

"traditional fishing areas" from "dredging * * * [and] other potentially disruptive activities" and "[e]ndangered or threatened species habitat * * * from incompatible development."

This case involves LUBA's review of the county's interpretation of those plan policies. In that kind of case, whether the LUBA order is "unlawful in substance" depends, in the first instance, on whether LUBA failed to properly defer to the county's interpretation of its own policies under ORS 197.829. That statute provides:

"(1) The Land Use Board of Appeals shall affirm a local government's interpretation of its comprehensive plan and land use regulations, unless the board determines that the local government's interpretation:

"(a) Is inconsistent with the express language of the comprehensive plan or land use regulation;

"(b) Is inconsistent with the purpose for the comprehensive plan or land use regulation;

"(c) Is inconsistent with the underlying policy that provides the basis for the comprehensive plan or land use regulation; or

"(d) Is contrary to a state statute, land use goal or rule that the comprehensive plan provision or land use regulation implements."

Much of the dispute between the parties about the county's interpretation of its policies concerns whether that interpretation was "inconsistent with the express language of the comprehensive plan" under ORS 197.829(1)(a). We described the application of ORS 197.829(1)(a) in *Western Land & Cattle, Inc. v. Umatilla County*, 230 Or App 202, 209-10, 214 P3d 68 (2009):

"Thus, under ORS 197.829, the rules of deference parallel some, but not all, rules of construction used in determining the meaning of an ordinance. Under the statute, if deference is owed to the locality's interpretation of its plan or regulation, then that interpretation must be affirmed. If

deference is not owed, LUBA can reverse that interpretation if it is inconsistent with the legislative intent in enacting the provision as revealed by the application of rules of statutory construction.

"* * * * *

"Whether a local government's interpretation of its comprehensive plan or land use regulation is 'inconsistent with the express language' of the plan or regulation under ORS 197.829(1)(a) 'depends on whether the interpretation is plausible, given the interpretive principles that ordinarily apply to the construction of ordinances under the rules of *PGE* [*v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993)].' *Foland v. Jackson County*, 215 Or App 157, 164, 168 P3d 1238, *rev den*, 343 Or 690 (2007). Put another way, the 'consistency with the express language' inquiry looks at the text of the plan provision or the regulation in question, as well as the context of other parts of the plan or regulation that are relevant to the textual meaning of that 'express language.'

"Thus, the reference in ORS 197.829(1) to 'express language' requires the application of constructional rules related to the text of an ordinance. Therefore, in determining whether a local government's interpretation of its land use plan or regulation is 'inconsistent with the express language of the comprehensive plan or land use regulation' under ORS 197.829(1)(a), we apply the statutory construction principles in ORS 174.010 and ORS 174.020(2) that are based on the 'express language' of a provision. Although those statutes are written to pertain to 'the construction of a statute,' we use them as well in the interpretation of local ordinances. *Ramirez v. Hawaii T & S Enterprises, Inc.*, 179 Or App 416, 425, 39 P3d 931 (2002). We also apply other textual canons of construction in evaluating a local government's interpretation of its plan or regulation under ORS 197.829(1)(a). Those canons include some rules applied in 'first level' *PGE* analysis, such as giving words of common usage their 'plain, natural, and ordinary meaning' and recognizing that 'use of the same term throughout a statute indicates that the term has the same meaning throughout the statute.' *PGE*, 317 Or at 611."

(Footnotes omitted.) *See also Siporen v. City of Medford*, 231 Or App 585, 598-99, 220 P3d 427 (2009), *rev allowed*, 348 Or

19 (2010) (ORS 197.829 requires LUBA to defer to a local government's plausible interpretation of its ordinances). We turn, then, to LUBA's determinations on the relevant plan policies.

## A. *Comprehensive Plan Limitations on the Scale of Development*

The Columbia River Estuary Land and Water Use Plan in the CCCP demarcates several Columbia River estuary planning subareas and sets out a plan for each of those subareas. The policies in each of those plans are "designed to provide local government officials, planners, and other plan users with the background information needed to evaluate development proposals" within the subarea.

The Bradwood subarea is a designated subarea and includes the property that intervenors seek to develop. The subarea is described in the CCCP as "the industrial area at Bradwood, a stretch of steep forested shoreline to the east, and portions of the Columbia River." The Bradwood subarea plan states that the "Bradwood industrial site offers limited potential for small to medium sized water-dependent industrial development." The subarea plan then provides that "[f]uture development which would require excessive filling (impacting aquatic areas in excess of 20 acres) along the Columbia River shoreline for the purpose of creating additional industrial land is not appropriate."

That "small to medium sized water-dependent industrial development" limitation is echoed in another subplan that is part of the county's comprehensive plan. The CCCP incorporates the Northeast Community Plan (NCP) that regulates land in the northern part of the county, east of Astoria. As incorporated into the applicable version of the CCCP, the NCP states a policy that petitioners contend precludes the approval of the rezonings—that "[d]evelopment activities at Bradwood shall be of small or moderate scale, not involving extensive filling to create new land areas."[2] The

---

[2] As relied on by the parties and LUBA, we refer to the NCP as incorporated into the version of the CCCP dated May 2004.

NCP contains a related finding that the "Bradwood industrial site is not currently used but offers excellent potential for small to medium size water dependent development."

In the initial justification for the plan/zone changes, the county concluded that the proposed LNG development was "of small or moderate scale" because it did not require more than 20 acres of fill and because the 40-acre development on the uplands around the proposed LNG storage tanks and gasification plant was less than 100 acres, which the county concluded was the standard for measuring whether development was "large" and not "small or moderate" in scale. In *Bradwood I*, LUBA held that the county erred in deciding that the scale of a development could be determined by the amount of fill alone and that the county needed to provide further justification that the proposed development activities were "small to moderate in scale" under the subplan standards. LUBA held:

> "The focus of the scale limitation is 'development activities,' which presumably encompasses more than construction of buildings. The county apparently viewed the scope of the proposed 'development' to include only the 40 upland acres covered by the LNG facility itself. The county declined to consider the area needed for accessory uses such as powerlines, gas pipelines, or the 58 [*sic*] acres of estuary that would be dredged for the ship turning basin.
>
> "The LWDUO defines 'development' as '[a]ny manmade change to improved or unimproved real estate, including but not limited to: construction, reconstruction, conversion, relocation or enlargement of any structure; any mining, excavation, landfill or land disturbance, any use or extension of the use of land.' That term would clearly encompass construction of powerlines and gas pipelines. It is less clear that it would encompass dredging of the estuary, although it would presumably include the pilings and other structures necessary to offload the LNG container ships.
>
> "Given that the county erred in its primary conclusion that the scale restriction is a mere restatement of the fill limitation, and because the county erred in limiting the scope of 'development activities' to the upland acres covered by the LNG facility itself, we conclude that remand is necessary for the county to re-evaluate whether the proposed

development activities, considered as a whole, comply with the 'small or moderate' scale limitation."

*Bradwood I*, 58 Or LUBA at 231-32.

On remand, the county reaffirmed that "large scale industrial development is that where the developed industrial site occupies more than 100 acres of land" and that a "small or moderate [in] scale" development is less than that size. In determining whether the "development activities at Bradwood" were less than 100 acres in size, the county addressed the meaning of "development activities" and "at Bradwood" under the CCCP standard. LUBA summarized:

"The county concluded that the proposed dredging of 46 acres of river channel adjacent to the former mill site is not 'development activity' 'at Bradwood' for purposes of the CCCP limitation and in any case is not 'development' within the LWDUO definition, so that the 46 acres proposed to be dredged need not be included in the total acreage proposed for 'development.' * * * The county also concluded that '[a]reas occupied during construction of a facility such as temporary construction easements for pipelines are not permanently occupied and are not part of the 100 acres.' * * * Based on those conclusions, the county concluded that the sum total of the acreage intervenors proposed to develop at Bradwood was just over 50 acres, which includes the 40 acres that will be permanently developed with the LNG facility at the former mill site, and 'inwater structures,' presumably referring to the pilings that must be installed in the Clifton Channel. The 40 acres used to calculate development activity at the former mill site apparently does not include approximately 30 acres of land that will be temporarily disturbed during construction.

"The county also made alternative calculations that took into account the 17.8 acres of powerline right of way within the entire county and the 6.2 miles of pipeline proposed to be developed within the entire county, albeit factoring in a 30-foot wide permanent easement rather than a 100-foot construction easement for pipeline construction, and concluded that even a conservative estimate of the total acreage of development yielded 80.4 acres, still less than the 100-acre threshold the county identified as exceeding 'small to moderate' development.

"Finally, the county calculated in the alternative than even considering the portion of the pipeline located on what the county termed 'Bradwood Landing Controlled Property,' and considering a 100-foot pipeline easement for construction, the total amount of acreage proposed for development activity was still less than 100 acres."

*Bradwood II,* ____ Or LUBA at ____ (slip op at 6-7) (footnote omitted).

In their petition for review to LUBA, petitioners contended that the county erred in concluding that (1) the "of small or moderate scale" standard meant less than 100 acres in all cases and (2) the "development activities at Bradwood" area that is relevant to the application of the scale standard should not include areas occupied during construction, the dredging area, and onsite and offsite pipeline easement areas. LUBA concluded that it was obliged to defer to the county's construction of the "of small or moderate scale" standard because it was a plausible meaning of the provision, relying on *Siporen.*

However, LUBA determined that the county's interpretation of "development activities at Bradwood" was implausible. Petitioners argued that "development activities," as used in the plan policy, meant "development activities" as defined in the comprehensive plan provisions relating to Goal 16. Under the CCCP discussion in Goal 16 of "development or use," an "activity" is "any action taken either in conjunction with a use or to make a use possible. * * * Several activities—dredging, piling, fill—may be undertaken for a single use—a port facility." According to LUBA, the area disturbed by construction activity for the project within the Bradwood subarea, as well as the area in the Clifton Channel that is proposed to be dredged, was "development activity" as defined by Goal 16.

Even under the less contextually relevant definition of "development" in the LWDUO, LUBA reasoned that the same result obtains. LWDUO 1.030 defines "development" to include "construction * * * [and] land disturbance." LUBA further reasoned that "at Bradwood" meant the entire Bradwood subarea, including the adjacent portion of the Columbia River. It noted that the county's position that only

land development is constrained by the policy is inconsistent with the county's findings that inwater docking structures within the Clifton Channel were included as part of "development activities at Bradwood." LUBA remanded the decision for a recalculation of the amount of acreage for "development activities at Bradwood" that is subject to the "of small or moderate scale" standard.

B. *Comprehensive Plan Resource Protection Policies*

Various parts of the Columbia River Estuary Land and Water Use Plan section of the CCCP set out required resource protections for the entire estuary. Section P20.2, relating to "Aquaculture and Fisheries," lists policies that "apply to all projects that could conceivably affect fisheries (either commercial or recreational) or aquaculture in the Columbia River Estuary." Policy 20.2(1) requires that "[t]raditional fishing areas shall be protected when dredging, filling, pile driving or when other potentially disruptive in-water activities occur." The area proposed to be rezoned to AD and dredged for a channel, turning basin, and docking facility is located in a "traditional fishing area," the Clifton Channel of the Columbia River.

In addition, Section P20.8, entitled "Fish and Wildlife Habitat," applies "to uses and activities with potential adverse impacts on fish or wildlife habitat, both in Columbia River estuarine aquatic areas and in estuarine shorelands." Policy 20.8(1) provides that "[e]ndangered or threatened species habitat shall be protected from incompatible development." Habitat for threatened and endangered species of salmonids, Columbia white tailed deer, stellar sea lions, marbled murrelet, and northern spotted owl is present in the rezoning areas, and a wildlife refuge is located close to the industrial site.

In its initial justification of the zone changes, the county used a legal dictionary definition of "protect" in evaluating compliance with those policies. In *Bradwood I*, LUBA held that the relevant meaning of "protect" in the plan policies was the definition of "protect" used in the statewide planning goals. 58 Or LUBA at 219. As defined under the statewide planning goals, "protect" means to "[s]ave or shield from loss, destruction, or injury or for future intended use." *See id.*

at 218. LUBA concluded that "the term 'protect' as used in CCCP Policy 20.2(1) and CCCP Policy 20.8, which implement Goal[s] 16 and 17, is intended to have the same meaning [as it has under the goals]." *Bradwood I*, 58 Or LUBA at 218-19. Accordingly, the board remanded the decision to the county "to apply the statewide planning goal definition of 'protect.'" *Id.* at 219.

On remand, the county interpreted the meaning of "protect" as defined in the statewide planning goals, and as used in CCCP Policies 20.2(1) and 20.8:

> " 'Protect' as defined by LCDC and as used by the County and acknowledged by LCDC in the County planning documents does not require that absolutely no disturbance occurs. Protection is provided by avoiding those areas to the extent possible and making development sensitive to the environment where it does in fact occur, so that estuarine and coastal shoreline values are maintained."

Based on that understanding of the meaning of "protect," the county adopted findings that the proposed zone changes were consistent with Policies 20.2(1) and 20.8 because the imposed limitations on dredging and disposal of dredged materials and other mitigation measures shielded traditional fishing areas and wildlife habitat from substantial adverse effects.

On review in *Bradwood II*, LUBA found that that meaning of "protect," within the context of plan policies that implement Goal 16, was too lax:

> "Although we agree with the county that the Goal definition of 'protect' does not require that estuarine resources identified for protection be completely or absolutely protected from any 'loss, destruction, or injury' whatsoever, the county has made a planning decision under the CCCP policies at issue that implement Goal 16 and the scheme set forth in the second paragraph of Goal 16, quoted above, to 'protect' as opposed to a decision to 'maintain,' 'develop,' or 'restore' traditional fishing areas and endangered or threatened species habitat. Having made that 'protect' planning decision, the local program to protect those estuarine resources must not allow 'loss, destruction, or injury' beyond a *de minimis* level. Thus, the development that is to be allowed by the disputed rezone is not consistent with the Goal definition of 'protect' unless the measures proposed in

seeking to rezone the property are sufficient to reduce harm to such a degree that there is at most a *de minimis* or insignificant impact on the resources that those policies require to be protected."

_____ Or LUBA at _____ (slip op at 18). LUBA also rejected the county's arguments that (1) the meaning of "protect" under Policies 20.2(1) and 20.8 could be determined by how "protect" is used in other parts of the plan, as well as in the LWDUO and other ordinances, and (2) findings on the protection of "estuarine values," as a whole, were sufficient to satisfy the directives of Policies 20.2(1) and 20.8. Board Member Holstun summarized in his concurring opinion:

> "The county's decision spends a good bit of time trying to reformulate its legal obligation under CCCP Policies 20.2(1) and 20.8 to 'protect' those resources as necessarily being satisfied by (1) simply applying existing acknowledged regulations that the county has adopted to protect estuarine resources, (2) showing that the estuary will be protected if the estuary is viewed as a whole, (3) mitigating any damage to those protected resources, (4) attempting to avoid damage to those protected resources, or (5) intending to avoid damage to those protected resources. I agree with the majority that those reformulations represent a misunderstanding of the county's legal obligation to protect the identified resources under Policies 20.2(1) and 20.8."

*Bradwood II,* _____ Or LUBA at _____ (Holstun, Board Member, concurring) (slip op at 31) (footnote omitted).

## II. ANALYSIS

### A. *Scale of Development*

■ On review, intervenors challenge LUBA's decision as to both the scale of the development and resource protection policies. We take each argument in turn. Intervenors argue that LUBA failed to give proper deference to the county's interpretation of "development activities at Bradwood." Intervenors initially assert that "at Bradwood" was properly interpreted to mean the shoreland area zoned for industrial use in the Bradwood subarea, rather than a larger area that includes other land in the subarea and under the river. We agree that it is plausible to interpret "at Bradwood" in the NCP to mean the "Bradwood industrial site" referenced

elsewhere in that plan; we also agree that the geographic definition of the Bradwood subarea in a different plan may not be relevant context for the NCP provision. The difficulty with the county and intervenors' more narrow construction of the meaning of "at Bradwood" is that it is inconsistent with LUBA's decision in *Bradwood I.*

In *Bradwood I,* LUBA remanded for more specific findings on the meaning of "development activities" as used in the phrase "development activities at Bradwood." The county had argued that "development" covered only "the 40 upland acres covered by the LNG facility itself." 58 Or LUBA at 231. LUBA held that "the county erred in limiting the scope of 'development activities' to the upland acres covered by the LNG facility itself." *Id.* LUBA concluded that a larger area was restricted by the policy and remanded to determine whether pipelines, docking structures and dredging areas outside the industrial site but within the Bradwood subarea were "development activities." *Id.*

■      As we have explained before,

> "[t]he Supreme Court has held that issues that LUBA decided in earlier proceedings, and upon which judicial review was not sought, are not subject to judicial review of a subsequent LUBA order. *Beck v. City of Tillamook,* 313 Or 148, 153, 831 P2d 678 (1992). Thus, when LUBA remands a case for further proceedings, the parties are limited to 'new, unresolved issues' relating to those remand instructions and cannot raise any 'issues that LUBA affirmed or reversed on their merits.' *Id.* at 153."

*Friends of the Metolius v. Jefferson County,* 230 Or App 150, 156, 213 P3d 1259 (2009); *see also Schatz v. City of Jacksonville,* 113 Or App 675, 679-81, 835 P2d 923 (1992) (discussing *Beck*). The more narrow meaning of "at Bradwood" advanced by the county in its remand findings is inconsistent with the decision and remand instructions given by LUBA in *Bradwood I.* For that reason, LUBA did not err in failing to defer to the county's interpretation of "at Bradwood" in the remand findings and in holding to its more expansive construction of that term. That construction of the meaning of "at Bradwood" as including the larger Bradwood subarea and adjacent estuary was not unlawful in substance.

■ Intervenors next complain that LUBA erred in not deferring to the county's interpretation of the acreage of "development activities" as not including land temporarily disturbed by construction of the proposed facilities and pipelines or the dredging area. We agree with LUBA that the county's interpretation of "development activities" is "inconsistent with the express language" of the plan policy under ORS 197.829(1)(a) in light of the contextual definitions of "development" in the LWDUO and "activities" in the CCCP. The CCCP defines "activity" to include "any action taken either in conjunction with a use or to make a use possible," including "dredging, piling, [and] fill." The disturbance of land "to make a use possible" is plainly within the meaning of "activity." Even more pointedly, "development" is defined by the LWDUO as "[a]ny man-made change to improved or unimproved real estate, including but not limited to: construction, reconstruction, conversion, relocation or enlargement of any structure; any mining, excavation, landfill or land disturbance, any use or extension of the use of land." "Development" includes, then, a change to real estate that occurs as part of "construction * * * of any structure" or "excavation." That plainly includes land disturbed as part of the construction of structures and land that is excavated by dredging.

We agree with LUBA that the county's reliance on the definition of "real estate" in an administrative rule on certification of real estate appraisers was not relevant context to the meaning of "real estate" as used in its code definition of "development." We also conclude that LUBA did not err in failing to address the county's findings on an alternative meaning of "small or moderate in scale." That alternative meaning (whether the project was large in comparison with other industrial developments) was beyond the scope of the remand in *Bradwood I* (whether the acreage of "development activities" exceeded the 100-acre standard established by the county). Thus, LUBA did not err in failing to defer to the county's interpretation of "development activities" and LUBA's own construction of the term was not unlawful in substance.

B. *Resource Protection*

Intervenors next assert that LUBA erred in remanding the decision because the county failed to adopt findings showing that it would "protect" traditional fishing areas and wildlife habitats from the effects of the planned dredging and related development. Intervenors claim that (1) petitioners failed to appeal some of the findings on compliance with the protection policies, and the adoption of those findings required LUBA to affirm the county's decision on the protection policies; (2) the contextual meaning of "protect" in the CCCP is revealed by acknowledged county ordinances and that meaning is less rigorous than the *de minimis* harm standard adopted by LUBA; and (3) the *de minimis* harm standard is inconsistent with the meaning of "protect" as used in Goal 16. Petitioners respond that (1) their appeal to LUBA did contest the county's determination that the protection policies were satisfied by mitigation efforts and that LUBA properly rejected that construction of the policies; (2) the acknowledged county policies on dredging and estuary development do not provide relevant context to the meaning of "protect"; and (3) LUBA's construction of the word "protect" was properly informed by the context of Goal 16.

▮    Intervenors' first argument is that the county made alternative findings that justified the rezonings—findings that "balanced" the protective policies with other plan policies promoting or limiting development; petitioners did not dispute that adopted rationale before LUBA; and so, LUBA erred in failing to affirm the county decision based on those alternative findings. LUBA is obliged to affirm a local government land use decision when the decision is justified on alternative bases and only one basis is challenged on appeal. *See Hard Rock Enterprises v. Washington County*, 36 Or LUBA 106, 119 (1999) ("Where a local government's approval rests on independent alternative grounds, petitioner must successfully challenge each of those alternative grounds in order to obtain reversal or remand of the decision, notwithstanding that petitioner demonstrates error in one of the alternative bases."); *cf. State ex rel Dept. of Human Services v. Parmentier*, 203 Or App 677, 682, 127 P3d 652, *rev den*, 340 Or 359 (2006) ("[A]s a practical and legal matter, it makes no sense to advance substantial arguments challenging one

basis for termination [of parental rights] where any consideration of those arguments will necessarily be precluded by the failure to assign error to the alternative ground for termination."); *State v. Stoudamire*, 198 Or App 399, 403, 108 P3d 615 (2005) (Armstrong, J., concurring) ("It is axiomatic that, when a trial court bases a decision on multiple grounds, an appellant may prevail on appeal only after demonstrating that *all* of the bases for the court's decision were erroneous." (Emphasis in original.)); *Roop v. Parker Northwest Paving Co.*, 194 Or App 219, 236, 94 P3d 885 (2004), *rev den*, 338 Or 374 (2005) ("[W]here plaintiffs fail to challenge the alternative basis of the trial court's ruling, we must affirm it.").

However, we conclude that the county's "balancing" findings are not an independent justification that the rezonings are consistent with the protection policies. Rather, those findings are nothing more than a restatement of the county's assertion that the protection policies should be construed in the context of other, less demanding, plan policies to allow significant adverse impacts by the dredging and related development on the protected areas. That position was attacked by petitioners in their appeal of the remanded decision to LUBA and was rejected by the board in its opinion.

Again, LWDUO 5.412(1) requires that rezonings be "consistent with the policies of the Clatsop County Comprehensive Plan." In its findings on remand, the county reasoned that, even if rezonings were inconsistent with the individual protective policies, the plan consistency standard required a "balancing" of relevant plan policies and that, on balance, the standard was met.[3] The adopted findings cite various policies that encourage development of shorelands with deep water access, require compatibility of industrial development with fishing, require development to "minimize adverse environmental and aesthetic impacts," and regulate disposal of dredged materials. The findings then conclude that

"[t]hese policies considered together and balanced are consistent with the LCDC definition of 'protect,' and the Plan

---

[3] The county stated that, "[a]lthough we find no conflict [with Policy 20.8(1)], if a conflict were found here, Clatsop County similarly seeks to balance development with protection."

does not require a showing that threatened and endangered species habitat or that traditional fishing areas will not be affected in any way or incur any loss, but rather promotes sensitive development that results in compatible development."

On review, intervenors argue that the case law allows a balancing of approval standards for a land use decision so as to allow approval when most of the standards are met. We conclude that the adopted findings overstate the "balancing" principle that can be used in the construction and application of local land use ordinances. We have held that a locality may need to reconcile facially inconsistent provisions of its land use regulations in making a land use decision. That was the case in *Waker Associates, Inc. v. Clackamas County*, 111 Or App 189, 193-94, 826 P2d 20 (1992). There, a county ordinance conditionally allowed golf courses in areas zoned for agricultural uses, subject to a showing of plan consistency. The plan policies both promoted and precluded golf courses. Application of the plan policies that would have precluded golf courses would negate the zoning provision allowing those conditional uses. We held that a balancing of those plan policies was "necessary in county actions on conditional use applications":

> "It follows that county decision-makers will often be confronted with situations, like this one, where a use is compatible with some of the goals and incompatible with others. It is not possible to approve or disapprove a use in those situations without engaging in a balancing exercise. Although the effect on and consistency of a proposed use with each of the goals must be considered, the weight to be given a goal and the magnitude of the effects that particular proposed uses will have on the values that different goals protect will inevitably vary from case to case."

*Id.* at 194.

A county, however, is not free to disregard a standard that precludes approval of a land use application merely because other standards favor, but do not compel, its allowance. In that case, it *is* "possible to approve or disapprove a use * * * without engaging in a balancing exercise." It is only when the standards themselves are incompatible in operation—by requiring both approval and disapproval of

any generic application—that an overarching reconciliation of clashing standards is necessary. Intervenors do not argue, and the county did not find, that *all* industrial development of the Bradwood area would be precluded by application of the protection policies. In this case, the plan policies that generally support industrial development of the Bradwood area or that work to minimize environmental impacts of development in general are not facially inconsistent with policies that protect traditional fishing areas and wildlife habitats from particular developmental impacts. As such, the policies need no balancing in their application.

Thus, the county's "balancing" justification is not an alternative route to an approval conclusion. Rather, it proceeds on the same path to the county's core conclusion—that the protection policies themselves should be interpreted to allow some significant adverse impacts on traditional fishing areas and wildlife habitats by the development facilitated by the rezonings. That is how the county framed its conclusion ("[t]hese policies considered together and balanced are consistent with the LCDC definition of 'protect' " as used in Policies 20.2(1) and 20.8). Petitioners attacked that conclusion—the determined meaning of "protect" in the protection policies—in their briefing below. LUBA decided that the county's construction of the policies was inconsistent with the LCDC definition of "protect." Thus, LUBA adequately addressed the county's balancing findings.

Intervenors next argue that the county's plan and implementing ordinances have been acknowledged as consistent with Goals 16 and 17; the county found that the decision under review complies with certain mitigation provisions in the plan and ordinances that implement those goals by limiting development; and therefore, the meaning of "protect" in the protective policies should be interpreted in much the same way—as requiring measures to mitigate, rather than prevent, harm.

The problem with intervenors' contention is that they once again seek to relitigate the outcome reached in *Bradwood I*. LUBA held in *Bradwood I* that "the term 'protect' as used in CCCP Policy 20.2(1) and CCCP Policy 20.8 * * * is intended to have the same meaning [as it has under

the goals]" and remanded the case to the county "to apply the statewide planning goal definition of 'protect.' " 58 Or LUBA at 218-19. That holding may or may not have been correct— either in not giving appropriate deference to the county's interpretation of its own comprehensive plan under ORS 197.829 or in not construing the meaning of "protect" contextually in light of other, related plan and ordinance provisions. It was, however, the determination in the first go-around of this case, and in the absence of an appeal from that decision, the county was limited to "new, unresolved issues" relating to the remand instructions in further proceedings. *See Beck,* 313 Or at 153. Thus, the county was obliged to apply the meaning of "protect" as used in Goals 16 and 17 and not the meaning of "protect" derived from related plan or ordinance policies. LUBA did not err in holding the county to its remand direction in *Bradwood I.*[4]

■     More to the point, intervenors argue that LUBA's construction of the meaning of "protect" as used in Goal 16 (and incorporated into the CCCP protection policies) was inconsistent with the text and context of the term as used in the goal. Intervenors reason that protective measures under the goal can be those that shield or guard the estuary from harm, rather than those that largely immunize the estuary from the effects of the dredging and related development.

---

[4] Intervenors' contention that LUBA erred in making factual findings that were not supported by substantial evidence in the county record merits only summary adjudication. Intervenors claim that LUBA's disagreement with the county's determinations on the protection policies was not supported by substantial evidence in the record. Intervenors articulate the wrong standard of review. We review a LUBA order for whether the order correctly applied substantive or procedural law. ORS 197.850(9) allows the court to reverse or remand a LUBA order only if it finds the "order to be unlawful in substance or procedure," ORS 197.850(9)(a), or "unconstitutional," ORS 197.850(9)(b). ORS 197.850(9)(c) allows review for whether the board order is "supported by substantial evidence in the whole record" only when LUBA is making factual determinations from a record created in proceedings "under ORS 197.835(2)." ORS 197.835(2)(b) authorizes the board to "take evidence and make findings of fact" when there are "disputed allegations of standing, unconstitutionality of the decision, ex parte contacts, actions described in subsection (10)(a)(B) of this section or other procedural irregularities not shown in the record that, if proved, would warrant reversal or remand." Misstatements by LUBA of the content of findings by a local government or agency may undercut the legal reasoning of LUBA's decision and make it "unlawful in substance." Intervenors' quibbles with factual statements by LUBA, however, are immaterial to the core issue on review—the meaning of "protect" as used in Policies 20.2(1) and 20.8 of the county's comprehensive plan.

Because Goal 16, in some circumstances, operates to allow some conflicting uses to estuarine resources, intervenors contend that "protect" under Goal 16 means to mitigate against harmful effects, rather than to preclude incompatible development. To assess that contention, we turn to the specific text of Goal 16.

Goal 16 (Estuarine Resources), OAR 660-015-0010(1), much like the other resource-specific goals, requires an inventorying and classification of the extent and quality of the relevant resource in the planning area and adoption of regulatory measures depending upon the quality of the resource. The stated purpose of the goal is:

> "To recognize and protect the unique environmental, economic, and social values of each estuary and associated wetlands; and
>
> "To protect, maintain, where appropriate develop, and where appropriate restore the long-term environmental, economic, and social values, diversity and benefits of Oregon's estuaries."

The goal requires classification of estuaries "to specify the most intensive level of development or alteration which may be allowed to occur within each estuary," and then to "provide for appropriate uses," with the caveat that "[e]stuary plans and activities shall protect the estuarine ecosystem, including its natural biological productivity, habitat, diversity, unique features and water quality."

Under the goal, the classification of estuaries is by "distinct water use management units." The types of units include, at a minimum, "natural," "conservation," and "development" management units. "Natural" management units include "major tracts of salt marsh, tideflats, and seagrass and algae beds" and are "designated to assure the protection of significant fish and wildlife habitats, of continued biological productivity within the estuary, and of scientific, research, and educational needs." Generally speaking, only undeveloped or low-impact uses are allowed in natural management units, including "protection of habitat, nutrient, fish, wildlife, and aesthetic resources." Certain physical improvements (*e.g.*, tidegates, pipelines, boat ramps) are

allowed "[w]here consistent with the resource capabilities of the area," which is defined to mean

> "when either the impacts of the use on estuarine species, habitats, biological productivity and water quality are not significant or that the resources of the area are able to assimilate the use and activity and their effects and continue to function in a manner to protect significant wildlife habitats, natural biological productivity, and values for scientific research and education."

"Conservation" management units, on the other hand, allow for "long-term uses of renewable resources that do not require major alteration of the estuary, except for the purpose of restoration." They are managed "to conserve the natural resources and benefits." Permissible uses "[w]here consistent with the resource capabilities of the area" include "[h]igh-intensity water-dependent recreation" and "[m]ining and mineral extraction, including dredging necessary for mineral extraction." In a conservation management unit, uses and activities are "consistent with the resource capabilities of the area"

> "when either the impacts of the use on estuarine species, habitats, biological productivity, and water quality are not significant or that the resources of the area are able to assimilate the use and activity and their effects and continue to function in a manner which conserves long-term renewable resources, natural biologic productivity, recreational and aesthetic values and aquaculture."

Finally, "development" management units are estuaries designated "for more intense development or alteration" and include "[n]avigation and water-dependent commercial and industrial uses," "[d]redge or fill, as allowed elsewhere in the goal," "[w]ater transport channels where dredging may be necessary," and other uses "[w]here consistent with the purposes of this management unit and adjacent shorelands."[5]

---

[5] The "[d]redge or fill, as allowed elsewhere in this goal" refers to specific standards for dredging that are set out in the implementation measures portion of the goal. Goal 16 Implementation Measure Two provides:

"Dredging and/or filling shall be allowed only:

"a. If required for navigation or other water-dependent uses that require an estuarine location or if specifically allowed by the applicable management unit requirements of this goal; and,

As used in the statewide planning goals, "protect" means to "[s]ave or shield from loss, destruction, or injury or for future intended use."[6] LUBA concluded that to "protect" an estuarine resource, as "protect" is used in Goal 16, means to regulate or prevent conflicting uses from affecting the resource in a significant way:

"Goal 16 requires protection of the environmental, economic, and social values, diversity and benefits of estuaries, and allows estuarine development and restoration only 'where appropriate.' The goal sets out a hierarchy of priorities for management and use of estuarine resources, placing in first priority '[u]ses which maintain the integrity of the estuarine ecosystem.' Within the remaining text of Goal 16, the word 'protect' appears almost exclusively in the Goal text describing the 'natural management unit' designation. That designation is the most protective classification of Goal 16 resources, and includes 'areas * * * designated to assure the *protection* of significant fish and wildlife habitats * * *.' The natural management unit allows uses and activities that allow the resources of the estuary to 'continue to function in a manner to *protect* significant wildlife habitats, natural biological productivity, and values for scientific research and education.' Thus, the most protective classification in Goal 16, the natural management unit designation, allows only activities that are sufficient to protect the identified resources.

"The Goal language describing the other designations also provides context for the meaning of 'protect.' The description of the 'conservation management unit,' which is the current management designation of the subject property, does not include the word 'protect.' The description of the 'development management unit,' the proposed designation of the property, also does not use the word 'protect.'

---

"b. If a need (i.e., a substantial public benefit) is demonstrated and the use or alteration does not unreasonably interfere with public trust rights; and,

"c. If no feasible alternative upland locations exist; and,

"d. If adverse impacts are minimized."

[6] By comparison, "maintain" is to "[s]upport, keep, and continue in an existing state or condition without decline," whereas "conserve" means to "manage in a manner which avoids wasteful or destructive uses and provides for future availability." The terms may overlap in some respects, although "maintain" and "conserve" appear to pertain to the manner in which property is used or managed and "protect" refers to the regulation of activities or uses external to the property itself.

Taken together, the uses of the word 'protect' within Goal 16 itself indicate that the definition is not equivocal in requiring that identified resources are 'saved' or 'shielded' from more than *de minimis* damaging impacts.

"Although we agree with the county that the Goal definition of 'protect' does not require that estuarine resources identified for protection be completely or absolutely protected from any 'loss, destruction, or injury' whatsoever, the county has made a planning decision under the CCCP policies at issue that implement Goal 16 and the scheme set forth in the second paragraph of Goal 16, quoted above, to 'protect' as opposed to a decision to 'maintain,' 'develop,' or 'restore' traditional fishing areas and endangered or threatened species habitat. Having made that 'protect' planning decision, the local program to protect those estuarine resources must not allow 'loss, destruction, or injury' beyond a *de minimis* level. Thus, the development that is to be allowed by the disputed rezone is not consistent with the Goal definition of 'protect' unless the measures proposed in seeking to rezone the property are sufficient to reduce harm to such a degree that there is at most a *de minimis* or insignificant impact on the resources that those policies require to be protected."

*Bradwood II*, ____ Or LUBA at ____ (slip op at 17-18) (emphases in original; footnote omitted).

Intervenors complain that LUBA's construction of "protect" is inconsistent with the practical operation of Goal 16 to allow development within estuaries and with the particular industrial designation of the Bradwood area. We fail to see the inconsistency. The protection policies apply to particular development, wherever located within an estuary, that could affect fisheries or wildlife habitat. CCCP Section P20.2 states the ambit of Policy 20.2(1), as "apply[ing] to all projects that could conceivably affect fisheries (either commercial or recreational) or aquaculture in the Columbia River Estuary." Section P20.8 frames the scope of Policy 20.8(1) as applying "to uses and activities with potential adverse impacts on fish or wildlife habitat, both in Columbia River estuarine aquatic areas and in estuarine shorelands." Thus, the plan expressly provides that the policies apply throughout the estuary, based on the nature of a proposed use or activity and

irrespective of management unit designation or zoning allowances.

Moreover, under Goal 16, the overall classification of an estuary as one in which development is allowed does not inhibit the designation of natural management units within that estuary in order to protect specific land resources. The Land Conservation and Development Commission adopted rules to implement Goal 16 that are codified at OAR chapter 660, division 17. Under those rules, estuaries are classified as "natural estuaries," "conservation estuaries," "shallow-draft development estuaries," and "deep-draft development estuaries," in much the same way as management units of an estuary are classified under Goal 16. *See* OAR 660-017-0010. The Columbia River is a deep-draft development estuary. OAR 660-017-0015(4). OAR 660-017-0025(3)(b) provides that "[s]hallow and deep-draft development estuaries shall have natural, conservation, and development management units as provided in the Estuarine Resources Goal." Thus, the overall character of an estuary as suitable for development is not inconsistent with the protection of discrete areas (natural management units) from the effects of particular development. It is consistent with the structure of Goals 16 and 17 in general, and with the plan allowance of industrial uses at Bradwood in particular, that the protection policies might inhibit intervenors' planned dredging uses and not other types of development.

We agree with LUBA's analysis of the meaning of "protect" under Goal 16. "Protect" is used in the policies relating to natural management units, which are designated, in part, to "assure the protection of significant fish and wildlife habitats." A use in those units must be "consistent with the resource capabilities of the area," which is defined to mean that the impacts of the use are not "significant" or that significant wildlife habitats can continue to be "protect[ed]." In other management units, where resource values are conserved or not immunized from development effects, alterations of the estuary that produce significant impacts are allowed. "Protect," in this context, means more than minimizing the adverse impacts of conflicting development through

mitigation. It means inhibiting development that causes significant adverse impacts on the protected resource.[7]

We conclude that LUBA did not err in remanding the decision to the county for further consideration of the consistency of the approvals with the standards in the protective policies.

Affirmed.

---

[7] "Protect" is used in other goals and may have a slightly different meaning in another context. For example, the objective of Goal 7 (Areas Subject to Natural Hazards) is to "protect people and property from natural hazards." The generic protection of "people and property" may be more elastic in nature than the specific protection of a discrete resource area.