Argued and submitted July 13, affirmed August 31, 2016, petition for review denied January 13, 2017 (360 Or 752)

**LENNAR NORTHWEST, INC.,**
*Respondent,*

*v.*

**CLACKAMAS COUNTY**
and Friends of Jennings Lodge,
*Petitioners,*

*and*

Patricia REINERT,
*Respondent below.*

Land Use Board of Appeals
2015100; A162228

380 P3d 1237

Nathan Boderman argued the cause for petitioner Clackamas County. With him on the brief was Stephen Madkour.

William K. Kabeiseman argued the cause for petitioner Friends of Jennings Lodge. With him on the brief was Garvey Schubert Barer.

Kelly S. Hossaini argued the cause for respondent. With her on the brief was Miller Nash Graham & Dunn LLP.

Before Sercombe, Presiding Judge, and Lagesen, Judge, and Tookey, Judge.

## SERCOMBE, P. J.

This case concerns whether, in denying a petition seeking higher density residential rezoning, a county hearings officer properly interpreted and applied the relevant rezoning approval standards. The Land Use Board of Appeals (LUBA) concluded that the hearings officer insufficiently explained the meaning of one of the standards that was applied to deny the rezoning. Neither Clackamas County nor respondent Friends of Jennings Lodge (collectively, respondents) challenge that determination on review. LUBA also concluded that the hearings officer erred in discounting the probative value of three other rezoning standards. On review, respondents argue that the hearings officer's "weighting" of the standards was appropriate. We review LUBA's order to determine whether it is "unlawful in substance." ORS 197.850(9)(a). We agree with LUBA's determination that the hearings officer erred in discounting the relevance of two of the rezoning standards and giving primacy to another rezoning standard. Accordingly, we affirm the LUBA order.

We take the relevant facts from LUBA's opinion. Petitioner Lennar Northwest, Inc., owns a 16.77-acre parcel of land located in the Jennings Lodge neighborhood of Clackamas County. That neighborhood is in an unincorporated area north of Gladstone and is bounded on the west by the Willamette River. The property was formerly used as a religious camp and conference center and is improved with institutional dwellings, an auditorium, and other structures. The property is zoned Immediate Urban Low Density Residential R-10 (R-10) under the Clackamas County Zoning and Development Ordinance (ZDO), a zoning district that generally requires a minimum lot size of 10,000 square feet. ZDO 315.04 (Table 315-2).

Petitioner seeks to redevelop the property into a 72-lot residential subdivision and, to that end, applied to the county for, among other things, a zone change to Immediate Urban Low Density Residential R-8.5 (R-8.5), a zoning district that allows lots with a minimum lot size of 8,500

square feet in area. *Id.*[1] The approval standards for zone changes are set out at ZDO 1202.03, which requires the county to determine whether "[t]he proposed zone change is consistent with the applicable goals and policies of the Comprehensive Plan" and to assess the adequacy of public utilities and streets for development under the proposed zoning district.

The particular "goals and policies" of the Clackamas County Comprehensive Plan (CCCP) applicable to the subject rezoning are set out at CCCP Policy 4.R.2:[2]

"Zoning of Immediate Urban Low Density Residential areas and conversion of Future Urban areas to Immediate Urban Low Density Residential shall include zones of 2,500; 5,000; 7,000; 8,500; 10,000; 15,000; 20,000, and 30,000 square feet (R-2.5 through R-30). The following factors guide the determination of the most appropriate zone:

"[Factor 1]   Physical site conditions such as soils, slope, and drainage:

"a.   Land with soils subject to slippage, compaction or high shrink-swell characteristics shall be zoned for larger lots.

"b.   Land with slopes of:

"•   Less than 20 percent shall be considered for the R-2.5 through R-8.5 zoning districts.

"•   20 percent or over shall be considered for the R-10 through R-30 zoning districts.

"c.   Land with hydrological conditions such as flooding, high water table or poor drainage shall be zoned for larger lots.

"[Factor 2]   Capacity of facilities such as streets, sewers, water, and storm drainage systems.

---

[1] Petitioner also sought preliminary subdivision approval. In particular, the subdivision approval application proposed to create a 72-lot subdivision with lots ranging in size from approximately 6,800 to 12,700 square feet in area. As noted by LUBA, ZDO 1014.04(B)(2) "allows 'flexible-lot-size developments' in the R-8.5 and R-10 zoning districts, and provides that the smallest lot permitted is 80% of the minimum parcel size specified in the applicable zoning district."

[2] The CCCP describes "low density residential areas" as "those planned primarily for single-family residential development, with a range of lot sizes from 2,500 square feet for attached single-family dwellings to 30,000 square feet for sites with environmental constraints."

"[Factor 3]  Availability of transit: Land within walking distance (approximately one-quarter mile) of a transit stop should be zoned for smaller lots implemented by the R-2.5, R-5, R-7, and R-8.5 zoning districts.

"[Factor 4]  Proximity to jobs, shopping, and cultural activities: Areas in proximity to trip generators shall be considered for smaller lots implemented by the R-2.5, R-5, R-7, and R-8.5 zoning districts.

"[Factor 5]  Location of 2,500- and 5,000 square-foot lots: Location of 2,500 and 5,000 square foot lots, implemented by the R-2.5 and R-5 zoning districts, may be allowed in Corridor design type areas and where permitted by Community and Design Plans located in Chapter 10.

"[Factor 6]  Need for neighborhood preservation and variety: Areas that have historically developed on large lots where little vacant land exists should remain zoned consistent with the existing development pattern. Otherwise, unless physical or service problems indicate to the contrary, areas of vacant land shall be zoned for lots of 8,500 square feet or smaller.

"[Factor 7]  Density average: To achieve an average of 7,500 square feet or less per lot in low density Future Urban areas when conversion to Immediate Urban low density residential occurs, the R-10 zone shall be limited to areas with 20 percent slope and greater. Flexible-lot-size land divisions and other buffering techniques shall be encouraged in those areas immediately adjacent to developed subdivisions with lots of 20,000 square feet or more to protect neighborhood character, while taking full advantage of allowed densities."

The hearings officer denied the zone change and subdivision approval applications, concluding that, although Factors 1, 2, and 3 supported the rezoning request, they were less important or "weighty" compared with Factor 6; Factor 4 was "neutral"; Factors 5 and 7 did not apply; and Factor 6 strongly supported a continuation of the existing zoning and controlled the outcome of the rezoning request.[3]

_____

[3] The hearings officer also concluded that the only "goal[] and polic[y]" of the CCCP that applied to the rezoning was Policy 4.R.2, rejecting respondents' contention that other goals and policies applied. LUBA affirmed that determination on appeal, and it is not at issue on review.

With respect to Factor 2, the hearings officer determined that, even though streets and public utilities could be extended into the property as it developed at a higher density, Factor 2 only "slightly supports a zone change to R-8.5 zoning." As noted, this was because, "[w]hile [Factors 1 and 2] might be dispositive in determining that a property should not be zoned for smaller lots, I believe they are less important in determining that a property should be rezoned for smaller lot sizes when other [factors] point the other way."

Regarding Factor 3, the hearings officer found that there was a bus stop on a street adjacent to the property that was less than one-quarter mile from two planned street entrances to the proposed subdivision, and another bus stop on a street slightly farther away from the property, but that the lack of sidewalks in the area made those bus stops less accessible and the factor less supportive of the zone change:

> "I believe some consideration can be given to the ability to reach the transit stops. Opponents argue the transit stop on River Road is dangerous to reach because it is [on] a busy, narrow road without sidewalks. * * * While the transit stop on River Road does require walking a short distance without sidewalks, I do not see that it is so prohibitive to render the transit stop not within walking distance. [Factor 3] slightly supports a zone change to R-8.5 zoning."

(Footnote omitted.)

As to Factor 4, although the hearings officer concluded that the property was proximate to jobs, shopping, and cultural centers, and that it was "in proximity to trip generators," he nonetheless determined that "there are not many jobs from the commercial corridor near the subject property, [and] the shopping is very limited." For that reason, the hearings officer determined that Factor 4 "does not strongly favor or disfavor" the zone change.

Furthermore, the hearings officer concluded that the policy in Factor 6 strongly supported a denial of the rezoning request. Factor 6 provides:

> "Need for neighborhood preservation and variety: Areas that have historically developed on large lots where little vacant land exists should remain zoned consistent with

the existing development pattern. Otherwise, unless physical or service problems indicate to the contrary, areas of vacant land shall be zoned for lots of 8,500 square feet or smaller."

The hearings officer found that the property "is entirely surrounded by other R-10 zoned properties." He noted that some underdeveloped properties in the area have been developed at higher densities, but those properties were near McLoughlin Boulevard (about one-third mile to the east). The hearings officer concluded that the subject property did not contain "vacant" land because the property had been put to use in the past, as had most of the nearby land. If properties were cleared of existing structures, in the view of the hearings officer, they would not necessarily be "vacant" under Factor 6 because that would be "an obvious end run around the [policy]." For those reasons, the hearings officer concluded that Factor 6 "strongly favors retaining the R-10 zoning of the property."

Finally, the hearings officer adopted a "balancing test" to evaluate the application of CCCP Policy 4.R.2:

"The balancing test essentially comes down to balancing the fact that the topography and available utilities would accommodate R-8.5 zoning and the property has a transit stop nearby against the need for neighborhood preservation and variety. * * *

"* * * * *

"* * * While the applicant argues that ten additional lots on such a large property would similarly not stand out, I believe that rezoning this property would have a very noticeable effect on the existing neighborhood. Furthermore, creating such a large island of R-8.5 zoning in a sea of R-10 would fragment the neighborhood. As opponents state, 'it is difficult to imagine a more intact, historically developed, large lot area than Jennings Lodge.' In my opinion, the need to protect such an existing intact R-10 neighborhood that has historically developed on large lots and has little vacant land outweighs the fact[s] that the property could accommodate R-8.5 zoning and has a bus stop nearby. Therefore, the proposed zone change is not consistent with the applicable goals and policies of the comprehensive plan. ZDO 1202.03(A) is not satisfied."

Thus, the hearings officer determined:

"As discussed earlier, under [Factors 1 to 7] there is a balancing test to determine the most appropriate zoning. [Factors 1 and 2] both weigh towards rezoning the property. Those [factors], however, are less weighty than some of the other [factors]. [Factors 1 and 2] only deal with whether the property is even available for smaller lot sizes due to topographical or utility characteristics. While they might be dispositive in determining that a property should not be zoned for smaller lots, I believe they are less important in determining that a property should be rezoned for smaller lot sizes when other [factors] point the other way. [Factor 3] regarding walking distance to transit stops slightly favors allowing the proposed zone change, while [Factor 4] regarding proximity to jobs, shopping, and cultural activities is basically neutral. [Factors 5 and 7] do not apply. [Factor 6] strongly favors retaining the current R-10 zoning."

Petitioner appealed the denial to LUBA, which ultimately reversed and remanded the county's decision. In LUBA's view, the hearings officer erred in (1) giving less weight to Factors 2 and 3 than he gave to Factor 6, (2) concluding that Factor 4 did not support the rezoning, and (3) explaining that Factor 6 supported denial of the rezoning.

With respect to the hearings officer's treatment of Factor 2, LUBA concluded that "nothing in the text of Policy 4.R.2 or the CCCP or the ZDO supports giving less weight to Factor 2." Regarding Factor 3, LUBA similarly determined that nothing in the applicable laws

"supports giving less weight to Factor 3. Having concluded that the property is 'within walking distance * * * of' at least two transit stops, Factor 3 provides that the property 'should be zoned for smaller lots implemented by' R-8.5 or smaller.

"* * * * *

"* * * There is nothing in the language that allows consideration of the quality of the walk depending on whether sidewalks are present or the amount of traffic in determining whether a transit stop is located 'within walking distance (approximately one-quarter mile)' of the property."

(First ellipsis in original.)

As noted, LUBA also determined that the hearings officer improperly discounted the application of Factor 4 to the rezoning. According to LUBA:

"Factor 4 guides the hearings officer to consider whether jobs and shopping are in proximity to the property, and dictates that properties in proximity to jobs and shopping 'shall be considered for smaller lots' allowed by R-8.5 zoning and zoning that allows ever smaller lot sizes. The hearings officer impermissibly evaluated Factor 4 by discounting the proximity to jobs and shopping based on an unexplained qualitative dismissal of the proximate jobs and shopping that is not supported by the express language of Factor 4. The express language of Factor 4 guides a conclusion that the most appropriate zone is R-8.5 or lower."

LUBA next concluded that the hearings officer inadequately explained the meaning of Factor 6:

"We agree with petitioner that the hearings officer's findings are inadequate to explain why a change from R-10 to R-8.5 zoning is not 'consistent with the existing development pattern.' The phrase 'development pattern' is not defined, but under respondents' interpretation the phrase is synonymous with 'zoning.' We reject that interpretation, because the county most likely would have used the word 'zoning' in place of 'development pattern' if it had intended that meaning. The hearings officer must explain his understanding of the meaning of 'consistent with the existing development pattern,' taking into consideration that (1) ZDO 1014.04(B)(2) allows lots that are zoned R-10 to be smaller than the 10,000 square foot minimum lot size by 20%, and accordingly allows the creation of new lots as small as 8,000 square feet in the R-10 zone; and (2) the evidence in the record demonstrates that subdivisions with lots smaller than 10,000 square feet have been created in the R-10 zone in the Jennings Lodge neighborhood under that ZDO provision. It is the 'existing development pattern,' not the existing zoning, that is the focus in Factor 6."[4]

(Citations omitted.)

---

[4] We set out the hearings officer's and LUBA's conclusions relating to Factor 6 as context for the rulings that remain under dispute. The legal correctness of LUBA's determinations as to Factor 6 are not before us on review. On remand, as part of the determination of the meaning of "consistent with the existing development pattern," the county will need to examine the manner in which the subject property and specified nearby areas have developed and the amount of vacant land on the property and in those areas. We note that the large parcel to be rezoned is already subdivided into a number of lots of varying sizes, some

Finally, LUBA repudiated the "balancing test" adopted by the hearings officer. LUBA's repudiation of that test is the core of respondents' disputes on review.

LUBA determined that the discounting of certain policies and the overall "balancing" of the factors by giving primacy to Policy 6 was not countenanced by CCCP Policy 4.R.2:

"We agree with petitioner that the hearings officer improperly construed Policy 4.R.2 and the Factors by unduly weighting Factor 6 without support for that weighting in anything in the text of the ZDO or the CCCP. * * *

"The Factors are not competing plan policies of the type at issue in *Waker* [*Associates, Inc. v. Clackamas County,* 111 Or App 189, 826 P2d 20 (1992)], and do not otherwise work at cross purposes or present competing choices of the type at issue in cases in which balancing several conflicting comprehensive plan policies may be required. In other words, the Factors are not 'incompatible in operation[.]' *See Columbia Riverkeeper v. Clatsop County,* 238 Or App 439, 457-58, 243 P3d 82 (2010) ('[i]t is only when the standards themselves are incompatible in operation—by requiring both approval and disapproval of any generic application— that an overarching reconciliation of clashing standards is necessary'). Policy 4.R.2 directs the county to consider the Factors to 'guide the determination of the most appropriate zone.' Nothing in the language of Policy 4.R.2 or any of the Factors suggests that some factors should be given greater weight than others. Factors 1-4 and 6 require consideration of (1) soils, slopes and drainage on the property; (2) capacity of public facilities; (3) proximity to a transit stop; (4) proximity to trip generators such as jobs, shopping and cultural activities; and (5) the need for neighborhood preservation and variety, to determine whether they present constraints or opportunities for higher density housing. On the present record, at least four of the seven Factors should guide the county to approve the requested R-8.5 zoning or a denser zone. Two Factors were found to be inapplicable. At most only one Factor, Factor 6, should guide the county to deny the requested rezoning. Accordingly, the language of Policy 4.R.2 requires the county to consider and evaluate *each* of the Factors to determine 'the most

_____

of which may not be improved and are vacant, and the parcel has been used for institutional uses in the past.

appropriate zone[.]' Instead of doing that, the hearings officer improperly assigned dispositive weight to Factor 6, improperly assigned lesser weight to Factors 1-4, and engaged in improper application of limiting considerations that have no basis in the language of Factors 1-4 to conclude the Factors were either neutral or weakly support R-8.5 zoning."

(Emphasis in original.)

On review, respondents contend that LUBA erred in requiring all seven factors in Policy 4.R.2 be considered equally, asserting that the plain text of the provision requires that particular zoning "shall" or "should" be applied under particular factual settings. They further argue that context suggests that the factors are to be "balanced" in the sense of giving effect to some, but not all, of the factors. Respondents submit that, even while all of the factors are considered in deciding the most appropriate zoning district for a property, in this case each of the factors would not suggest the same residential density, so that some factors necessarily hold more sway, thus necessitating some sort of "discretionary balancing." According to respondents, that is what the hearings officer did: He determined that, although some factors supported a higher-density zone, another factor, by its terms, requires lower-density zoning. Finally, respondents claim that the hearings officer was correct in evaluating Factor 3 (availability of transit) and Factor 4 (proximity to trip generators) based on the quality of any current access to transit and the quantity of motor vehicle trips in the immediate area.

ORS 215.427(3)(a) requires that a county approve or deny a rezoning application "based upon the standards and criteria that were applicable at the time the application was first submitted." More specifically, ORS 215.416(8)(a) provides:

"Approval or denial of a permit application shall be based on standards and criteria which shall be set forth in the zoning ordinance or other appropriate ordinance or regulation of the county and which shall relate approval or denial of a permit application to the zoning ordinance and comprehensive plan for the area in which the proposed use of land

would occur and to the zoning ordinance and comprehensive plan for the county as a whole."

*See also* ORS 197.175(2)(d) (requiring cities and counties to "make land use decisions * * * in compliance with the acknowledged plan and land use regulations").

There is no dispute in this case that the "standards and criteria" that apply to the rezoning are set out at ZDO 1202.03 and include the standard that the "proposed zone change is consistent with the applicable goals and policies of the Comprehensive Plan." As noted, CCCP Policy 4.R.2 sets out the relevant "factors" to "guide the determination of the most appropriate [residential] zone." The ZDO allows the same permitted and conditional uses in the R-5 to R-30 zoning districts, ZDO 315.03 (Table 315-1). Thus, the selection of the most appropriate zone among those zoning districts under CCCP Policy 4.R.2 largely depends on how those factors guide the determination of the appropriate density for residential development.

In its application of CCCP Policy 4.R.2a, the county must be guided by the statutory construction principles stated in ORS 174.010:

"In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."

*See Western Land & Cattle, Inc. v. Umatilla County*, 230 Or App 202, 210 & n 2, 214 P3d 68 (2009) (applying ORS 174.010 in the context of interpreting a county land use ordinance). In resolving ambiguities or inconsistencies among competing comprehensive plan provisions or land use regulations, a locality should examine the express text of the policy and the context of that policy (related portions of the same law or of laws that regulate the content of the policy in question). *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (determining legislative intent in enactment of legislation by examining the text, context, legislative history, and general maxims of statutory construction); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859

P2d 1143 (1993). *Cf.* ORS 197.829 (requiring deference by LUBA to a local government's interpretation of a provision in a comprehensive plan or land use regulation if the interpretation is not inconsistent with the express language of the provision, the purpose for the provision, the underlying policy that provides the basis for the provision, or the state law that the provision implements).

LUBA, for its part, reviews a local government's interpretation of its land use ordinances for whether the locality "[i]mproperly construed the applicable law[.]" ORS 197.835(9)(a)(D). As noted, LUBA must defer to some local government interpretations of a comprehensive plan or land use regulation if the interpretation is not inconsistent with the standards in ORS 197.829.[5] However, in an appeal proceeding to which ORS 197.829 does not apply, LUBA reviews a local government's interpretation of its land use ordinances for legal correctness; that is, for whether the interpretation is consistent with the statutory construction rules set out in ORS 174.010 to 174.090, *PGE*, and *Gaines*. We, in turn, assess whether LUBA's application of those statutory construction rules was "unlawful in substance." ORS 197.850(9)(a).

Turning to that task, we agree with LUBA that the hearings officer improperly added additional provisions to Factor 3 in applying that factor to the rezoning request. *See* ORS 174.010 (a decision-maker must not "insert what has been omitted" in the "construction of a statute"). The hearings officer determined that Factor 3 was only "slightly support[ive]" of the requested R-8.5 zoning because there were no sidewalks connecting the property to the transit stops.

But the text of Factor 3 provides that, if the property is within walking distance of a transit stop, then the property "should be zoned" R-2.5, R-5, R-7, or R-8.5. The

---

[5] As we have explained, ORS 197.829 does not require LUBA to defer to an interpretation of a county code made by a hearings officer (as opposed to deference owed to an interpretation by the county governing body that enacted the law). *Gould v. Deschutes County*, 233 Or App 623, 629, 227 P3d 758 (2010) ("In interpreting the county code, we give no deference to the interpretation made by the hearings officer or by LUBA."); *cf. Gage v. City of Portland*, 319 Or 308, 315-17, 877 P2d 1187 (1994) (similar limitation on the common-law rule of deference to local government's interpretation of its own laws).

hearings officer, however, interpreted that text to say something completely different—that the property might not be zoned to a higher density residential district because the property is not improved with connecting sidewalks. As we observed in an analogous case, "The county's decision is supported by no language in the ordinances that it is supposedly interpreting." *Foland v. Jackson County*, 215 Or App 157, 164, 168 P3d 1238, *rev den*, 343 Or 690 (2007). Factor 3 might be interpreted to suggest a higher-density zoning district than R-8.5 if the property was very close to a transit stop. But it cannot plausibly be understood to mean that property within walking distance of a transit stop "should not be zoned" to at least R-8.5. A directive that the property "should be zoned" R-8.5 is more than "slightly supportive" of that result.

Similarly, LUBA correctly determined that the hearings officer erred in interpreting Factor 4. The hearings officer concluded that Factor 4 neither strongly favored nor disfavored R-8.5 zoning. The factor provides that, if the property is proximate to "trip generators," then it "shall be considered" for the density allowed by R-2.5, R-5, R-7, or R-8.5 zoning. Because, in this case, the property is proximate to trip generators, by its terms, Factor 4 "strongly favors" ("shall be considered") a rezoning to one of those higher-density zoning districts. The hearings officer, however, diminished that legal effect because of his determination that nearby commercial land generated a relatively low number of trips. That modification is not supported by any part of the text of Factor 4 and is inconsistent with the obligation to "'ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted[.]'" *Western Land & Cattle, Inc.*, 230 Or App at 210 n 2 (quoting ORS 174.010).[6]

Finally, LUBA correctly determined that the hearings officer erred in construing Policy 4.R.2 to preclude the complete application of some of the relevant factors to the rezoning request under the guise of "balancing." It is true,

---

[6] Assuming that the amount of trip generation would be relevant to which of the higher-density zoning districts should be applied, the limited trip generation here would arguably "strongly favor" the less dense R-8.5 zoning.

as we observed in *Waker Associates*, that a locality may need to reconcile facially inconsistent provisions of its land use regulations in making a land use decision. 111 Or App at 193-94. But decisional standards are facially inconsistent in application when two or more provisions *require* different and incompatible results. Reconciliation of those types of inconsistent policies can sometimes be made by application of less directory standards through a "balancing" of each of the directives with the remaining criteria to determine the cumulative effect of all of those standards. But that type of balancing, at least in the sense of ignoring the effect of one standard in favor of the remaining criteria, is not necessary when *all* of the standards can be applied or considered.

We reiterated that principle in *Columbia River-keeper*:

> "A county, however, is not free to disregard a standard that precludes approval of a land use application merely because other standards favor, but do not compel, its allowance. In that case, it *is* 'possible to approve or disapprove a use * * * without engaging in a balancing exercise.' It is only when the standards themselves are incompatible in operation—by requiring both approval and disapproval of any generic application—that an overarching reconciliation of clashing standards is necessary."

238 Or App at 457-58 (emphasis and ellipsis in original).

The factors in Policy 4.R.2 are not incompatible in operation. Instead, the factors "guide the determination of the most appropriate zone." Only one of the Policy 4.R.2 factors is directory or mandatory in nature. Factor 1(c) provides that "[l]and with hydrological conditions such as flooding, high water table or poor drainage *shall be zoned* for larger lots." (Emphasis added.) But that subfactor does not apply to petitioner's rezoning. Two of the remaining factors are suggestive of an appropriate range of density. Factor 3 provides that land within walking distance of a transit stop "should be zoned" for the higher-density residential zoning. Factor 6 states that certain infill land "should remain zoned" at a density consistent with the existing development pattern. Both Factor 3 and Factor 6 suggest a particular result or range of results (that property should be or remain zoned)

that should occur unless application of the other factors cumulate to guide a different determination. Neither factor, however, compels a particular zone or precludes the application of any other factor. To the extent that the hearings officer concluded that some factors should not apply to support the rezoning because of the need for "balancing" those factors with Factor 6, the hearings officer erred. *See* ORS 174.010 ("[W]here there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."). Instead, each factor should be applied separately in evaluating the appropriate zone or range of zones for the property, and then the cumulative effect of the application of all of the factors should be assessed.[7]

In sum, LUBA's order was not unlawful in substance in concluding that the hearings officer erred in giving less determinative effect to Factors 3 and 4 and in determining that Factor 6 required a denial of the rezoning request.

Affirmed.

---

[7] We note that we disagree with LUBA's opinion in one minor respect. LUBA suggested, in *dictum*, that "[n]othing in the language of Policy 4.R.2 or any of the Factors suggests that some factors should be given greater weight than others." It is true that nothing in Policy 4.R.2 suggests that any factor not be considered in the evaluation of a rezoning request. But it is not true that all of the factors have the same qualitative effect in their application. As just noted, however, Factor 1(c) directs large-lot zoning ("shall be zoned") for land with hydrological constraints, a direction that would control without regard to the application of the other factors. And Factors 3 or 6 might be more suggestive of the proper result ("should be zoned" or "should remain zoned") than most of the other individual factors. However, that disagreement with *dicta* in LUBA's opinion does not affect the result of this case on review.